**Phillip R. BACA, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 92–584C.**

United States Court of Federal Claims.

Sept. 24, 1993.

Roger V. Eaton, Albuquerque, NM, for plaintiffs.

Hillary A. Stern, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for summary judgment. The issue presented is whether

plaintiffs, who serve in the position of Convoy Commanders for the Department of Energy, GS–084, grade GS–10, are exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (1988) (the "FLSA").

## FACTS

The following facts are undisputed, unless otherwise indicated. On May 22, 1986, the Transportation Safeguards Division ("TSD") of the Department of Energy (the "DOE") issued an internal memorandum to Convoy Commanders concerning the impact of certain regulations promulgated by the Office of Personnel Management ("OPM") on October 25, 1983. These regulations, which became effective on July 3, 1985, among other changes, modified the applicability of the 80–percent requirement contained in each of the FLSA exemption provisions, including the executive, administrative, and professional exemptions.

Prior to the implementation of these regulations, in order to qualify for any exemption under the FLSA, employees who ranked below a GS–10 were required to spend 80 percent or more of worktime engaged in certain specified duties; these duties varied according to the exemption. For example, to qualify under the executive exemption criteria, an employee was required to spend 80 percent or more of his time "on supervisory and closely related work." 5 C.F.R. § 551.203(a)(6) (1983). Under this regulatory regime, DOE maintained that Convoy Commanders, who at the time held a grade ranking of GS–9, failed to satisfy the 80–percent criterion. Convoy Commanders did not fall within the realm of any exemptions and, therefore, were entitled to overtime benefits pursuant to the FLSA.

The October 25, 1983 regulations modified the applicability of the 80–percent requirement for each exemption by declaring that the specification governed only employees classified below GS–7. As a result of this change, in the May 22 memoran-

dum, TSD, acting on behalf of DOE, declared all Convoy Commanders exempt employees under the FLSA,[1] thereby extinguishing their entitlement to the overtime benefits that they had previously received as nonexempt employees under the prior regulatory scheme. *See* 29 U.S.C. §§ 207, 213. This action forms the basis of plaintiffs' complaint.

On July 21, 1986, the Organization and Personnel Division of DOE sought to obtain a waiver for Convoy Commanders to allow them to remain in nonexempt status. This waiver request was denied. DOE then initiated proceedings to upgrade the classification of Convoy Commanders from a grade ranking of GS–9 to GS–10. On August 5, 1987, DOE granted the position upgrade. Convoy Commanders receive a limited amount of overtime compensation pursuant to OPM regulations, but these benefits pale in comparison to the overtime benefits that nonexempt employees receive under the FLSA.

Despite DOE's efforts to mitigate the effects of the classification of Convoy Commanders as exempt employees under the FLSA, several Convoy Commanders ("plaintiffs") disputed the denial of overtime benefits and filed a complaint in the United States Claims Court on August 26, 1992, requesting unpaid overtime premiums, liquidated damages, attorneys' fees, and an injunction against any future violations of the FLSA. Plaintiffs moved for summary judgment contending that as a matter of law they are nonexempt employees entitled to overtime benefits under the FLSA. Defendant cross-moved arguing that plaintiffs fall squarely within the FLSA executive exemption. Disposition of these motions hinges on the following factual allegations made by the parties concerning the employment capacity in which plaintiffs serve.

The federal job description of Convoy Commander calls for plaintiffs to supervise a team of specially trained couriers who

---

1. Gregory Gonzales, a Procurement Analyst for DOE, testified in deposition taken on June 26, 1992, that Convoy Commanders qualified as ex-

empt employees pursuant to the executive exemption, 5 C.F.R. § 551.204 (1993).

are responsible for ensuring the safe transportation of various nuclear materials[2] across the United States. The couriers who assist Convoy Commanders hold grade rankings of either GS–7, GS–8, or GS–9 and are nonexempt employees under FLSA. Hence, these couriers, unlike plaintiffs, receive overtime benefits pursuant to the FLSA.

The nuclear materials are transported by tractor trailers, and the duration of each trip is approximately four to six days. Because of the nature of the items shipped, all couriers undergo intensive instruction on infantry-type combat operations to ensure that each courier is capable of defending against "a modern, well-equipped terrorist group." Def's Proposed Findings of Uncontroverted Facts filed June 29, 1993, ¶ 6. According to plaintiffs, all couriers, *i.e.,* exempt and nonexempt, train together. In addition, plaintiffs contend that all grade levels of couriers, including Convoy Commanders, work together and have three principal duties on each trip: driving the vehicle, operating the radio, and sleeping. Every courier, regardless of grade level, rotates through each of these tasks on four-hour increments. Defendant responds that plaintiffs ignore a fourth critical function of Convoy Commanders, which is to supervise and manage the other couriers on the trip.

In addition to these duties, on each trip, Convoy Commanders serve in one of three functions: 1) the Convoy Commander in Charge (the "CCIC"); 2) the Assistant Convoy Commander (the "ACC"); or 3) the courier in charge of one vehicle (the "CIC").[3] Defendant asserts that in each of these positions Convoy Commanders exercise supervisory responsibilities. To support this characterization, defendant cites plaintiffs' job description, which, without referencing a specific position or function, states that the Convoy Commander assumes "[o]verall responsibility for ensuring the highest possible degree of safety to the public and security to the shipment...."

Plaintiffs contest defendant's depiction of their job function and assert that Convoy Commanders only perform supervisory duties when they serve as the CCIC, which occurs on approximately 33 percent of the trips.[4] Designation of a Convoy Commander as the CCIC depends primarily on the overtime status list, in that the commander with the least amount of overtime assumes the position of CCIC. Plaintiffs assert that notwithstanding the fact that they possess certain supervisory responsibilities as CCIC, their responsibilities at all other times are no greater than those of the GS–9 lead couriers, who are nonexempt employees under the FLSA.

Plaintiffs and defendant vigorously dispute the level of supervision associated with the position of CCIC. Both parties agree that the CCIC: 1) conducts the pre-trip briefing for the courier convoy team; 2) prepares reports; 3) evaluates courier performance; and 4) reports disciplinary infractions. During the pre-trip briefing, the CCIC announces vehicle and job assignments and discusses the trip route, new standards of procedure, security tactics, and weather conditions. This briefing occurs immediately prior to convoy departure.

At the close of the trip, the CCIC must complete a variety of paperwork, including trip reports, vehicle logs, purchase forms, and itineraries. The CCIC also must fill out evaluation forms for all GS–9 couriers on the trip. Plaintiffs contend that the nonexempt GS–9 couriers complete the same evaluation form for all personnel traveling in their vehicles. After gathering the evaluation forms, the CCIC signs the forms and then sends them to the appropri-

---

**2.** These materials consist of "nuclear weapons, weapon components, test assemblies and devices, and strategic quantities of weapons grade special nuclear materials...." Def's Proposed Findings of Uncontroverted Facts filed June 29, 1993, ¶ 1.

**3.** Plaintiffs contend that the nonexempt GS–9 lead couriers normally serve as the CIC.

**4.** Defendant maintains that plaintiffs, as Convoy Commanders, serve as CCIC between 30 to 68 percent of their total travel time.

ate supervisory personnel.[5] The evaluation forms are computer grid forms which, per the deposition of Dwight Brown, Mar. 23, 1992, a Convoy Commander and plaintiff in this action, include the following choices: outstanding, highly successful, fully satisfactory, marginal, and unsatisfactory.

Although the CCIC completes evaluation cards, the CCIC has no actual authority to recommend promotions or raises, according to plaintiffs. Plaintiffs also question whether the evaluation forms are given any substantive weight in the final employee review process. With regard to disciplinary authority, plaintiffs contend that their authority is limited to reporting disciplinary infractions to Headquarters and that they have no input as to the severity of such discipline.

Defendant claims that the CCIC not only possesses authority to recommend couriers for promotions and raises, but that the CCIC's recommendations are carefully considered. Everett R. Goodman, Acting Chief of TSD, attests that "[t]he input from Convoy Commanders accounts for most of a subordinate courier's performance appraisal." Affidavit of Everett R. Goodman dated Sept. 9, 1993, ¶ 8. Disputing plaintiffs' contention that any courier can complete an evaluation form, Mr. Goodman states that only Convoy Commanders can complete employee evaluations because the Automated Courier Evaluation System (the "ACES") accepts only "Convoy Commander or Section management identification codes." Goodman Aff. ¶ 10(F).

Plaintiffs assert that despite their duties to brief the couriers and complete various paperwork, including courier evaluations, the authority of Convoy Commanders when serving as CCIC is substantially confined.

According to plaintiffs, when they serve as CCIC, they, in fact, make very few decisions, because the "transportation specialist section chief, assistant section chief, and executives in the TSD make all the decisions concerning selection of couriers for the trip, assignment of the couriers to the truck or car, route selection, overnight stops, ... route changes, and equipment repairs...." Plfs' Proposed Findings of Uncontroverted Facts filed Mar. 31, 1993, ¶ 13. Plaintiffs also maintain that the CCIC exercises little discretion because the CCIC is required to adhere to the instructions specified in the Standard Operating Procedures (the "SOPs"). The SOPs include instructions for all basic scenarios that arise during the transportation of a shipment. To deviate from the SOPs, plaintiffs explain, the CCIC must first contact Headquarters personnel, via SECOM,[6] to request guidance as to the specific problem that has arisen.

Defendant disputes plaintiffs' portrayal of the CCIC's authority, arguing that "the way in which a particular trip is accomplished ... [remains] within the control and discretion of the CCIC ... [who] must make many important and independent decisions while on ... [the] trip...." Def's Proposed Findings ¶ 16 (citations omitted). Defendant contends that, contrary to plaintiffs' assertions, the CCIC, who supervises up to 23 couriers of lower grade, including security specialists, senior security specialists, and lead security specialists, makes decisions regarding courier job and vehicle assignments and where to stop the convoy. In addition, the CCIC is the final authority for interpreting the SOPs, which defendant describes as mere guidelines, not binding requirements. Finally, defendant asserts

---

**5.** According to the deposition of George Martinez, May 26, 1992, a Convoy Commander and plaintiff in this action, in some instances the CCIC completes the evaluation forms for all couriers in the transport section, and the ACC fills out the forms for those couriers assigned to the rescue section.

**6.** SECOM "is a digital communications network" designed to alert headquarters staff as to the location of the convoy. Def's Statement of Genuine Issues filed June 29, 1993, ¶ 9. The

communications system also serves as the link between the CCIC and Headquarters. Thus, when problems arise, the CCIC contacts SECOM. SECOM then contacts the appropriate Headquarters personnel and creates a communications link so that the CCIC can speak directly with supervisory personnel. According to the affidavit of Mr. Goodman, the CCIC contact with SECOM "is for security reasons and not to obtain guidance or direction." Goodman Aff. ¶ 7.

that "[r]arely does anyone ... dictate [to the CCIC] how the trip is to be conducted or overrule a CCIC decision...." Def's Proposed Findings ¶ 20 (citation omitted); *see* Goodman Aff. ¶ 6. Defendant notes that this characterization of Convoy Commanders' duties fully comports with the position description of Convoy Commander, which states that Convoy Commanders maintain "responsib[ility] for planning and carrying out the assignments ..., coordinating the work with others as necessary, and interpreting policy on [their] own initiative...."

Plaintiffs do not dispute that in the event of an extreme emergency situation when the CCIC is unable "to obtain advise or assistance from [a] higher level," the CCIC exercises a greater level of discretion and decisionmaking authority than he exercises under normal circumstances. Def's Proposed Findings ¶ 15. Defendant maintains that in an emergency, such "decisions can have monumental consequences," given the hazardous nature of the shipment materials and the substantial threat to national security posed by the loss and/or destruction of a shipment. *Id.* ¶ 16.

In the position of ACC, plaintiffs assert that Convoy Commanders assume the responsibilities of the CCIC only in the event that something happens to the CCIC, rendering him incapable of continuing his duties. If, for example, the CCIC is asleep and an emergency arises, the ACC merely wakes the CCIC to handle the problem. Defendant contends that some CCIC's confer greater supervisory responsibilities on the ACC's.

Plaintiffs further argue that while serving as the ACC or CIC, Convoy Commanders function no differently than their nonexempt GS-9 lead courier colleagues. Specifically, plaintiffs point out that both grades of employees prepare reports; evaluate employees; obtain supplies; verify compliance with operating procedures; provide on-the-job training for new personnel; assign personnel; and redistribute work assignments. Defendant rejoins that assigning personnel and redistributing work assignments, although performed by GS-9 lead couriers, is conducted by such couriers only at the direction of the CCIC. Cognizant of some similarities in job functions, defendant ardently emphasizes that the GS-9 lead couriers do not possess the management and supervisory responsibilities of Convoy Commanders. Defendant also notes that Convoy Commanders have many unique responsibilities that GS-9 lead couriers do not possess, such as assuming overall responsibility for the protection of the entire nuclear shipment.

Finally, plaintiffs contend that Convoy Commanders not only share the same duties as nonexempt GS-9 lead couriers when serving as the ACC or CIC, but also participate in similar duties when they are not traveling. Between trips, Convoy Commanders and other couriers remain at Headquarters, where they allegedly train and maintain their physical fitness levels. Defendant responds that although all couriers essentially perform the same function while at Headquarters, Convoy Commanders are still regarded as supervisors · by other couriers.

## DISCUSSION

### 1. *Motion for summary judgment*

█ Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered

as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). A trial court may deny summary judgment, if "there is reason to believe that the better course would be to proceed to trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted).

### 2. *The FLSA*

Pursuant to the FLSA, employees, including federal employees, may not work in excess of 40 hours per week without receiving overtime compensation at the rate of one and one-half times the employees' regular rate of pay.[7] 29 U.S.C. § 207(a) (1988). This overtime scheme applies to all employees except those who fall within one of the FLSA exemption provisions, including the executive, administrative, and professional exemptions. 29 U.S.C. § 213(a)(1). Thus, as soon as a group of employees are deemed to qualify for an exemption, they immediately forfeit their eligibility to receive FLSA overtime benefits.

■ Two separate entities interpret the FLSA exemption provisions. The Department of Labor (the "DOL") promulgates regulations interpreting the scope of the FLSA as it applies to the private sector.[8] *See* 29 U.S.C. § 204. OPM, formerly the Civil Service Commission, determines the scope of the FLSA exemptions for federal workers. 29 U.S.C. § 204(f); *Zumerling v. Devine*, 769 F.2d 745, 750 (Fed.Cir.1985). Determining whether a federal employee qualifies for one of the FLSA exemption provisions requires a thorough review not only of OPM regulations, contained at 5 C.F.R. §§ 551.201–.208, but also of all "supplemental interpretations or instructions ... issued by the Office of Personnel Management," including advisory letters.[9] 5 C.F.R. § 201 (1993); *see* 5 C.F.R. §§ 551.-101–.541 (1993). OPM's interpretations of the exemption provisions are restricted only in the sense that they must be consistent with "the rulings, regulations, interpretations, and opinions of the Secretary of Labor...." *American Fed'n of Gov. Employees v. OPM*, 821 F.2d 761, 769 (D.C.Cir. 1987).

■ The employer bears the ultimate burden of proving entitlement to an FLSA exemption. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–197, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 209, 86 S.Ct. 737, 749, 15 L.Ed.2d 694 (1966); *Brennan v. Southern Productions, Inc.*, 513 F.2d 740, 744 (6th Cir.1975); 5 C.F.R. § 551.202(b). This represents a weighty burden for the Government for two reasons. First, defendant must affirmatively prove each specific element of the exemption. *Walling v. General Industries Co.*, 330 U.S. 545, 547–48, 67 S.Ct. 883, 884, 91 L.Ed. 1088 (1947). Second, although courts interpret the general provisions of the FLSA liberally, the exemption provisions are interpreted narrowly. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); *Hamblen v. Ware*, 526 F.2d 476, 477 (6th Cir.1975); *Amshey v. United States*, 26 Cl.Ct. 582, 590 (1992) (citing *Fleming v. Hawkeye Pearl Button Co.*, 113 F.2d 52, 56 (8th Cir.1940)); 5 C.F.R. § 551.202(a).

■ Only employees that plainly and unmistakably fall "within the terms and spirit of the exemption[s]" constitute exempt employees, who are denied FLSA overtime

---

**7.** On May 1, 1974, Congress extended coverage of the FLSA to federal employees. Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, §§ 6(a)(1), (6), 88 Stat. 58, 60 (codified at 29 U.S.C. §§ 203(d), (x) (1988)).

**8.** In addition to the private sector, the Secretary of Labor is authorized to issue regulations interpreting the FLSA as it applies to certain federal entities, including the Library of Congress, Unit-

ed States Postal Service, Postal Rate Commission, and the Tennessee Valley Authority. 29 U.S.C. § 204(f).

**9.** These advisory letters, which are addressed to the heads of federal agencies and departments, are commonly referred to as FPM (Federal Personnel Management) Letters.

benefits. 5 C.F.R. § 551.202(a). If any reasonable doubt exists as to whether an employee qualifies for an exemption, the employee shall be deemed nonexempt. FPM Letter No. 551–7 (July 1975). Thus, to establish that an employee is exempt under the FLSA, defendant, in effect, must overcome a presumption of nonexempt status. *Amshey*, 26 Cl.Ct. at 590. In evaluating whether defendant has satisfied this burden, the court must embark on "a voyage through fact-bound waters." *Harris v. District of Columbia*, 741 F.Supp. 254, 259 (D.D.C.1990). This type of voyage precludes the court from presuming exempt status based on job title alone. *Christenberry v. Rental Tools, Inc.*, 655 F.Supp. 374, 377 (E.D.La.1987), *aff'd mem.*, 851 F.2d 1419 (5th Cir.1988) (Table).

DOE Procurement Analyst Gregory Gonzales, the individual responsible for determining the status of Convoy Commanders for purposes of the FLSA, testified in his June 26, 1992 deposition that Convoy Commanders qualify as exempt employees because they satisfy the criteria set forth in the executive exemption, 5 C.F.R. § 551.-204. Consistent with this determination, defendant, in briefing its position, argued only the executive exemption to substantiate its claim that Convoy Commanders qualified as exempt employees. As a consequence, although plaintiffs have diligently briefed their case under each of the FLSA exemption provisions, the court will examine plaintiffs' and defendant's arguments only with regard to the executive exemption.

The executive exemption inquiry contains three elements, each of which must be clearly proved by defendant to warrant a finding of exempt status:

> 1) [The] ... employee ... manages a Federal agency or any subdivision thereof (including the lowest recognized organizational unit with a continuing function) and regularly and customarily directs the work of at least three subordinate employees (excluding support employees) ...; [and]

> 2) The employee's primary duty consists of management or supervision ...; [and/or]
> 3) [If the employee is a] foreman level supervisor[ ] in the Federal Wage System (or the equivalent in other wage systems), ... [a] GS–7 through GS–9 ... subject to ... [29 U.S.C. §] 207(k), ... [or a] GS–5 or GS–6 ..., [such employee] must spend 80 percent or more of the worktime in a representative workweek on supervisory and closely related work.

5 C.F.R. § 551.204.

The third prong, frequently referred to as the "80–percent test," has limited applicability. OPM, in one of its advisory letters, reiterated its policy that only the primary duty test, as opposed to the 80–percent test, applies to employees with a federal grade ranking of GS–10 and higher. FPM Letter No. 551–22, 53 Fed.Reg. 1331 (1988) (codified at 5 C.F.R. § 551.204(b)). "At these high supervisory and management levels, there is no basis for applying the strict 80 percent test...." *Id.* Convoy Commanders holding a GS–10 rating therefore need only meet the primary duty test and the first prong of the executive exemption inquiry, noted above, to qualify as exempt employees.

> 3. *Criterion that the employee manages a subdivision of a federal agency, including the lowest recognized organizational unit with a continuing function, and regularly and customarily directs the work of at least three subordinate employees*

Defendant argues that Convoy Commanders satisfy the first prong of the executive exemption because they are supervisors or managers who manage a subdivision of a federal agency, including the lowest recognized organizational unit thereof with a continuing function. Defendant defines the lowest recognized organizational unit as a convoy team on a specific trip and supports this definition by noting that, although the identity of the members of a convoy team changes with each trip, the composition of the team remains constant. For example, each convoy team always con-

tains "lead security specialists ...; senior security specialists ...; security specialists ...; and couriers...." Def's Br. filed June 29, 1993, at 15. In addition, defendant notes that the Convoy Commander position description specifically states that Convoy Commanders supervise the couriers on each trip. Accordingly, defendant contends that "the organizational component[, or unit,] known as the convoy team is always under the supervision of the [C]onvoy [C]ommander." *Id.*

Plaintiffs insist that by defining the recognized organizational unit as the convoy team, defendant ignores a critical aspect of the first prong of the executive exemption.[10] Specifically, plaintiffs note that the governing regulation does not solely require that the employee manage or supervise the "lowest recognized organizational unit," but, rather, that the employee manage or supervise the "lowest recognized organizational unit *with a continuing function.*" 5 C.F.R. § 551.204 (emphasis added). Plaintiffs contend that defendant has failed to satisfy this requirement because the continuing function of the convoy team, *i.e.,* to safely transport nuclear materials, cannot occur absent support from TSD Headquarters ("TSDH").[11] Accordingly, plaintiffs define the lowest recognized organizational unit as including both TSDH and the convoy team, not the convoy team alone.

Although the parties dispute TSDH's level of involvement in the convoy process, neither party disputes that Convoy Commanders frequently contact TSDH throughout the course of each trip. Generally, the CCIC, as opposed to other couriers on the trip, maintains contact with TSDH.

The specific reasons for this contact are immaterial. Instead, all that is relevant for purposes of defining the lowest recognized organizational unit with a continuing function is whether or not the convoy operation can and does proceed effectively without any TSDH involvement. The current record, which includes depositions submitted by both parties, indicates that TSDH involvement is a necessary element. TSDH appears to be a part of the continuing function of safely transporting nuclear materials across the United States.

If it were otherwise and TSDH did not play a role in the convoy process, no rationale appears as to why Convoy Commanders, as the depositions indicate, repeatedly contact TSDH during trips, nor is there an explanation as to why the Convoy Commander job description specifically discusses contacting supervisors for advice and assistance during trips. Hence, in this case, it is certainly arguable that the lowest recognized organizational unit with a continuing function is TSDH and the convoy team. Under this interpretation defendant would be deemed to have failed to satisfy its burden with regard to the first prong of the executive exemption, because, based on the facts of record, Convoy Commanders in no way can be construed to manage or supervise TSDH and the convoy team.

This result would be consistent with both *Amos v. United States,* 13 Cl.Ct. 442, 447 (1987), a case which interprets the phrase "lowest recognized organizational unit," and FPM Letter No. 551-7. In examining whether cook foremen at a correctional facility constituted exempt employees, the *Amos* court held that the employer had met

---

10. Plaintiffs further argue that defining the lowest "recognized organizational unit" as the convoy team conflicts with FPM Letter No. 551-7, which provides, in pertinent part:
   *Recognized Organizational Unit:* An established and defined organizational entity with regularly assigned employees. This requirement distinguishes supervisors who are responsible for planning and accomplishing a continuing workload from "leaders" ... who direct the work of other employees assigned to a project but do not exercise full supervision over such employees.

Plaintiffs argue that Convoy Commanders do not come within this definition because Convoy Commanders do not exercise full supervision over the other couriers. Because the parties vigorously dispute the issue of Convoy Commanders' supervisory authority, summary judgment on this issue is inappropriate.

11. Based on the record, TSDH appears to include decisionmakers such as the Section Chiefs of the three courier regions.

its burden with regard to the "recognized organizational unit" requirement because the supervised employees, *i.e.*, the food service workers, comprised a recognized organizational unit. The requirement was deemed satisfied despite the fact that the food service workers frequently rotated through various food service groups, such as food preparation, serving, and cleaning. Some workers served in a specific group for up to six months. Cook foremen also rotated through all of the various groups, but their rotation occurred on a daily basis. According to *Amos*, the apparent fluidity of both workers and cook foreman between food service groups does not preclude the employer from satisfying the recognized organizational unit requirement. This finding seems appropriate, however, because the *Amos* court defined the lowest recognized organizational unit as the entire food service division, as opposed to each individual food service group. Specifically, the court stated that "[t]he unit was, operationally, a cohesive unit dedicated to perform a specific function; i.e., food preparation and service...." 13 Cl.Ct. at 447. The movement of employees between groups was immaterial.

If the court had defined the lowest recognized organizational unit as one food group, instead of the entire unit, it would have ignored both the continuing function requirement and the definition contained in FPM Letter No. 551–7, which provides that a "recognized organizational unit" consists of "[a]n established and defined *organizational entity* with *regularly assigned* employees." (Emphasis added.) First, as the *Amos* court correctly noted, all food service groups together performed a continuing function: "food preparation and service." 13 Cl.Ct. at 447. Moreover, the cook foremen supervised all of the food service workers because they were required to rotate through each of the groups on a daily basis. Second, the food service workers undeniably constituted regularly assigned employees in the food service division of the prison system. They may have rotated between groups within that divi-

sion, but they were permanently assigned to that division. Moreover, the food service division remained organizationally distinct from other divisions of the prison system because the workers performed duties separate and distinct from other inmate job categories.

Like the food service workers in a specific group who cannot carry out the entire food service function without the other groups, the couriers on a specific trip cannot carry out the continuing function of safely transporting nuclear materials without TSDH. Unlike the cook foremen in *Amos*, who rotated among the various food service groups each day, each of which was integral to the overall continuing function, Convoy Commanders do not rotate through TSDH, a component that appears to be part of the continuing function of the transportation process. Furthermore, the couriers, including Convoy Commanders, are regularly assigned to the organizationally distinct entity, TSD, but are not regularly assigned to a specific convoy team. Following the logic of *Amos* and FPM Letter No. 551–7, the recognized organizational unit with a continuing function in the case at bar arguably could be TSDH and the convoy team, as plaintiffs contend.

Defendant, however, argues that defining the convoy team as the recognized organizational unit does not contradict the definition of "recognized organizational unit" set forth in FPM Letter No. 551–7. Presumably, defendant, had it cited *Amos*, would similarly argue that identifying the convoy team as a recognized organizational unit would not be inconsistent with *Amos*. In support of its theory, defendant cites 29 C.F.R. § 541.104 (1993), a DOL regulation, for two propositions. First, the regulation provides that "the unit supervised need not be physically within the employer's establishment and may move from place to place, and that continuity of the same subordinate personnel is not absolutely essential to the existence of a recognized unit with a continuing function...." 29 C.F.R. § 541.104(c).[12] Second, the regulation

---

**12.** The remainder of this regulation reads: "al-

though in the ordinary case a fixed location and

states that "an otherwise exempt employee [will not] lose the exemption merely because he draws the men under his supervision from a pool if other facts are present which indicate that he is in charge of a recognized unit with a continuing function...." 29 C.F.R. § 541.104(e). Defendant further contends that the fact the CCIC operates with instruction or input from Headquarters does not preclude a finding that the convoy team satisfies the definition of a "recognized organizational unit."

Although this DOL regulation bears on the issue of defining the lowest recognized organizational unit, the court, at this time, will not determine the weight to be accorded to it. Once the court identifies the specific duties and responsibilities of Convoy Commanders through trial, the court will be in a better position to resolve the issue. In addition, even assuming, *arguendo*, that the regulation is dispositive, it states that drawing men from a pool will not preclude a finding of exempt status so long as *"other facts are present which indicate that ... [the Convoy Commander] is in charge of a recognized unit with a continuing function."* (emphasis added). Given the parties' numerous disputes concerning the actual authority of Convoy Commanders, summary judgment cannot enter on the present record.

The second aspect of the first prong of the executive exemption inquiry requires that Convoy Commanders regularly and customarily direct the work of at least three subordinate employees. Defendant argues that Convoy Commanders satisfy this requirement because they direct the work of at least 23 couriers on each convoy team, all of whom hold GS ratings below GS–10. Plaintiffs concede that Convoy Commanders may supervise employees on the trip, but dispute that they direct the work of subordinates.

Plaintiffs' semantic distinction is not persuasive. In fact, the term "direct" not only is commonly used as a synonym for "super-

vise," but also is frequently employed to define the term "supervise." *See Webster's New World Dictionary,* 1430 (2d ed. 1974) ("supervise [means] to oversee, direct, or manage...."). Given that one who supervises often directs work, plaintiffs' admission that Convoy Commanders supervise three subordinate employees actually supports defendant's position.

As CCIC, the record clearly reflects that Convoy Commanders direct the work of at least three employees, because they bear the responsibility for assigning each member of the 23–member convoy team a specific job function. Although the parties dispute who bears the responsibility for determining the actual assignments, neither party contests that Convoy Commanders, when serving as the CCIC, shoulder the responsibility of actually informing each team member of his respective duties. Not only does the CCIC render these assignments, the CCIC also maintains responsibility for ensuring that these assignments are completed properly while on the trip.

Moreover, Convoy Commanders serve as the CCIC, at a minimum, during one third of their total travel time. Even assuming, *arguendo*, that Convoy Commanders did not direct the work of three subordinate employees while acting as the ACC or CIC, which presumably constitutes two thirds of their total travel time, the amount of time spent as CCIC satisfies the regulatory requirement of regularly and customarily directing the work of at least three employees.[13]

### 4. *Criterion that the employee's primary duty consists of management or supervision*

The primary duty requirement is satisfied if the employee

(1) [h]as authority to select or remove, and advance in pay and promote, or make any other status changes of subordinate employees, or has authority to suggest and recommend such actions with particular consideration given to these suggestions and recommendations; and

continuity of personnel are both helpful in establishing the existence of such a unit...."

**13.** DOL defines "customarily and regularly" to mean "a frequency which must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.207(g).

(2) [c]ustomarily and regularly exercises discretion and independent judgment in such activities as work planning and organization; work assignment, direction, review and evaluation; and other aspects of management of subordinates, including personnel administration.

5 C.F.R. § 551.204.

a. *Criterion that the employee has authority to suggest and recommend status changes for subordinate employees, with particular consideration given to those suggestions*

The parties do not dispute that Convoy Commanders alone cannot make status changes with regard to a specific employee. The parties do dispute vigorously whether Convoy Commanders have authority to suggest and recommend status changes, such as promotions or disciplinary actions, and whether the relevant supervisors give these suggestions and recommendations particular consideration, as required by the first factor of the primary duty test.

Plaintiffs argue that Convoy Commanders have no unique authority to recommend promotions. Although Convoy Commanders complete computerized grid evaluation forms for all GS–9 couriers, they are not the only employees who fill out such forms. According to plaintiffs, any employee may fill out a form concerning any other employee on the trip. Moreover, the record establishes that the nonexempt GS–9's complete the same evaluation forms for the couriers within their specific vehicles. The deposition of Leo Greigo, Apr. 23, 1992, a Convoy Commander, suggests that, per internal agency rules, Convoy Commanders, however, must sign each GS–9 evaluation form. Defendant also contests plaintiffs' characterization by arguing that the evidence "overwhelmingly demonstrates that the Convoy Commanders have ... authority to recommend and suggest ... [certain] personnel actions" and that such recommendations are given particular weight and consideration. Def's Br. filed June 29, 1993, at 18.

Contrary to defendant's assertion, nothing in the record "overwhelmingly demonstrates" the exact level of consideration given to these evaluation forms. Although the record may indicate that Convoy Commanders have authority to make recommendations regarding status changes, this authority differs radically from the authority to recommend an action and to have a supervisor seriously consider such recommendation before taking final action on the matter. The facts before the court as of this date are unclear as to whether the recommendations are accorded the required weight and consideration as stipulated by the first factor of the primary duty test. Because the court cannot resolve this issue based on a conflicting record, this issue represents an issue of material fact in controversy and forecloses a grant of summary judgment.

Notwithstanding that the court cannot at this time rule on this issue, it appears, based on the current record, that Convoy Commanders have no real authority to make substantive personnel decisions. The factual setting put forth by defendant conveys the message that Convoy Commanders serve only as a reporting device as to the events that occurred on the trip. Acting as a mouthpiece for what occurred and having a substantive influence on personnel decisions, such as a promotion or disciplinary action, constitute two distinct concepts. The utility of the computerized evaluation forms that Convoy Commanders complete is questionable, given that the form leaves no space for written comments. Also, because the questions on the form and the answer options are limited in scope, often a completed form may not accurately depict an employee's performance level. The forms may provide little, if any, information to the supervisors actually making the personnel decisions.

b. *Criterion that the employee customarily and regularly exercises discretion and independent judgment in work planning and organization; work assignment, direction, review, and evaluation; and other aspects of management of subordinates, including personnel administration*

Plaintiffs argue that defendant has failed to meet its burden with respect to

the second factor of the primary duty analysis, because Convoy Commanders, even when acting as the CCIC, do not exercise discretion and independent judgment regarding work planning, organization, and assignments. According to plaintiffs, TSD performs these integral job functions, not Convoy Commanders. For example, plaintiffs assert that TSD determines vehicle assignments, stipulates where the convoy should stop, and decides the appropriate course of action when an event arises that is not covered in the SOP. Plaintiffs further contend that Convoy Commanders do not direct the subordinates on the trip because the couriers simply follow the SOPs, which cover all standard procedures. Defendant, of course, contests this portrayal, arguing instead that Convoy Commanders possess broad discretion to make vehicle assignments, to stop the convoy, and to refer to the SOPs as mere guidelines, as opposed to a directive.

Again, the parties dispute material issues of fact so that a grant of summary judgment cannot enter. The court does note that defendant, in arguing its position that Convoy Commanders possess substantial discretion, often makes broad conclusory statements to support its position. Defendant cannot overcome the presumption of nonexempt status merely by articulating sweeping generalizations. Instead, defendant must identify specific instances wherein Convoy Commanders regularly exercise discretion and independent judgment.

Even assuming, *arguendo*, that defendant correctly indicates that Convoy Commanders exercise discretion in the event of an actual attack on the shipment or in an emergency situation where they are unable to reach TSD, this alone cannot be the dispositive factor governing compliance with the primary duty test, because the regulation specifically requires that Convoy Commanders "customarily and regularly" exercise discretion in work planning and organization. As previously noted, DOL

defines "customarily and regularly" to mean "a frequency which must be greater than occasional but which, of course, may be less than constant." [14] 29 C.F.R. § 541.-207(g). Emergencies, such as an actual attack, do not occur on a "greater than occasional" basis. Defendant therefore must provide additional evidence that Convoy Commanders exercise discretion and independent judgment over management, organization, planning, assignment, and personnel administration in order to satisfy the second factor of the primary duty test.

Plaintiffs and defendant further dispute the meaning of the phrase "customarily and regularly." Plaintiffs argue that even assuming Convoy Commanders exercise discretion and independent judgment while serving as the CCIC, Convoy Commanders fail to meet the customarily and regularly requirement because they preside in this position only one third of the total trip time. This court finds that one third of the total trip time represents a sufficient frequency to satisfy the "customarily and regularly" requirement.

### 5. *Conflicts with the FLSA system*

Plaintiffs' final argument rests on the theory that the civil service system, governed by OPM, and the FLSA system, governed by DOL, conflict because the FLSA regulations declare as nonexempt any employee who devotes more than 20 percent of his time to non-executive functions. Plaintiffs argue that "[t]his time test is designed to weed out bona fide executives from working foremen" and that under this test Convoy Commanders are nonexempt employees. Plfs' Br. filed Mar. 31, 1993, at 28. Plaintiffs further argue that, consistent with the holding in *American Federation of Government Employees*, whenever a conflict exists between the two regulatory systems, the conflict must be resolved in accordance with the broader interpretation, 821 F.2d at 770, which in this case plaintiffs attest would be the FLSA interpretation.

Although not identical, OPM has included a provision in its executive exemption

---

**14.** Pursuant to the directive of *American Federation of Government Employees*, 821 F.2d at 771, OPM amended its regulations pertaining to the

executive exemption to include the phrase "customarily and regularly" to ensure consistency with DOL regulations and requirements.

that parallels the FLSA 20–percent requirement. This provision, previously referenced, is commonly referred to as the 80–percent rule. This rule applies to certain categories of employees and requires that such employees work at least 80 percent or more of a representative workweek on supervisory or closely related work. Specifically, the 80–percent rule applies to "foreman level supervisors in the Federal Wage System (or the equivalent in other wage systems), ... GS–7 through GS–9['s] ... subject to ... [29 U.S.C. §] 207(k), ... [and] GS–5 or GS–6['s]." 5 C.F.R. § 551.-204(b). DOL's 20–percent rule contains a similar applicability restriction in that the provision pertains only to those employees on a salary basis who earn a specified amount of money. 29 C.F.R. § 541.1(f).

According to *American Federation of Government Employees,* "[w]hen the civil service and FLSA systems conflict, OPM must defer to the FLSA so that any employee entitled to overtime compensation under the FLSA receives it under the civil service rules." 821 F.2d at 770. In the case at bar, Convoy Commanders, given their GS rating, would not qualify for the FLSA 20–percent rule because their weekly earning capacity as GS–10's exceeds the limitations set forth by DOL. The Convoy Commanders' GS rating also precludes them from reaping the benefit of OPM's 80–percent rule, since the rule applies only to employees below GS–7. Plaintiffs' argument regarding a conflict in the systems is illusory. Under both systems Convoy Commanders would be denied the benefit of the applicable percentage-of-time tests.

## CONCLUSION

Accordingly, based on the foregoing, the cross-motions for summary judgment are denied. The parties previously explored settlement. The discussion of the evidence developed to date would suggest that their efforts be resurrected. A scheduling order has been entered separately.

**IT IS SO ORDERED.**