Teresa M. SHAW, Plaintiff–Appellant,

v.

PRENTICE HALL COMPUTER PUB-
LISHING, INC., a/k/a Macmillan Com-
puter Publishing, Inc., Defendant–Appel-
lee.

No. 97–3116.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1998.

Decided Aug. 4, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 16, 1998.

Robert S. Rifkin (argued), Maurer, Rifkin
& Hill, Indianapolis, IN, for Plaintiff–Appel-
lant.

Richard A. Smikle, Thomas E. Mixdorf
(argued), Ice, Miller, Donadio & Ryan, India-
napolis, IN, for Defendant–Appellee.

Before MANION, ROVNER and DIANE
P. WOOD, Circuit Judges.

MANION, Circuit Judge.

Teresa Shaw sued her former employer,
now known as Macmillan Computer Publish-

ing, Inc.,[1] for violating the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, because she had regularly worked more than 40 hours per week but was not paid overtime. After a bench trial, the district court concluded that Shaw's position as production editor was exempt under the Act as a bona fide administrative employee. Shaw appeals and we affirm.

## I. Background

Shaw began working for Macmillan in May 1993 as a production editor. Macmillan publishes computer-related books. The entire process from the point an idea for a book is conceived to the point the finished product is shipped is complex and involves many different people who contribute in larger or smaller amounts to the finished product. This case concerns the process after a completed manuscript enters the editing process, at which point the manuscript is assigned to a managing editor. The managing editor sets the overall schedule for the process and assigns the book project to a production editor like Shaw.

Shaw's job as production editor involved various tasks and responsibilities—including training new employees, designing new forms, and participating on a design team to revise a product line. As the job related to the editorial process, it had two main parts: an editorial component and a project management component. As a project manager, Shaw delegated work to copy editors, proofreaders, and employees in the Illustration Department. She set and monitored deadlines so that the book project would be completed in accord with the overall schedule set by the managing editor. As an editor, Shaw, among other things, reviewed the work of the proofreaders and copy editors and accepted or rejected their suggested edits. She also edited the book herself for "clarity and readability as well as for grammar, word choice and spelling." Shaw could also contact the author to suggest that more substantial changes be made. No one reviewed Shaw's editing decisions.

The district court concluded that the project management was the more significant component of Shaw's job. Specifically, the court found that Shaw's "primary duty, that which was most valuable to Macmillan, was to manage and coordinate book projects through the entire editorial and production process. Shaw served as a link between the managing editor and other members of the editing/production team. She was responsible for monitoring and enforcing internal deadlines within the overall schedule set by her managing editor." In performing these tasks, Shaw was expected to be very organized and to act as a troubleshooter, solving problems as they arose or preempting them.

Macmillan paid Shaw a salary. She started at $24,000 per year and received incremental raises, ending up at $27,850 after about two years. No one kept track of the number of hours Shaw worked, although Macmillan concedes it was more than 40 per week. Production editors were expected to put in whatever time was necessary to meet the production deadlines, and Shaw sometimes worked until the early morning hours. The production editors and managing editors had an informal understanding that if a production editor put in a lot of late work, she could take some time off (perhaps coming in late or leaving early) to compensate. Macmillan does not suggest that this "comp time" was on an hour-for-hour basis or that it brought the hours Shaw worked in a week to 40 or less. Shaw never received additional compensation for working more than 40 hours in a week.

Shaw could have suffered some sort of "burnout" at her job because her initially high ratings in reviews eventually declined. Macmillan terminated Shaw in September 1995, and she then brought this suit under the FLSA, claiming that she had worked more than 1,400 hours of overtime for which Macmillan was required to pay her one-and-

---

1. When Shaw began working for the defendant it was known as Prentice Hall Computer Publishing, Inc., which was a subsidiary of Prentice Hall, Inc. The defendant is now called Macmillan Computer Publishing, Inc. We shall follow the lead of the parties and the lower court and refer to the defendant as "Macmillan," its current name. The defendant does not dispute that the proper party has been sued.

a-half times her normal hourly rate of compensation. Macmillan asserted that as a production editor Shaw was exempt from the time-and-a-half provisions because she was either a bona fide administrative employee or a bona fide professional employee. After a two-day bench trial, the district court found that Shaw was not a professional employee but was an administrative employee, and therefore exempt.

## II.  Analysis

We review the district court's findings of historical fact and the inferences to be drawn from them only for clear error. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). We will conclude that a finding is clearly erroneous if, after reviewing the entire record, we have the definite and firm conviction that the district court made a mistake. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The district court's interpretation of the statute and regulations is a question of law reviewed *de novo*. And its ultimate application of the facts to the legal standard is also a question of law. *Icicle Seafoods*, 475 U.S. at 714, 106 S.Ct. 1527.

The FLSA requires a covered employer to pay time-and-a-half to employees who work more than 40 hours per week. 29 U.S.C. § 207(a)(1). But it need not do so for "bona fide executive, administrative, or professional" employees. 29 U.S.C. § 213(a)(1). The FLSA does not define these terms, but directs the Secretary of Labor to promulgate regulations doing so, and these regulations have the binding effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1069 (7th Cir.1997) (citing *Batterton*). The Secretary has also promulgated interpretive regulations, which serve as guides to the Secretary's view of the Act's application to various fact settings. These interpretive regulations do not have the force of binding law. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Bat-*

*terton*, 432 U.S. at 425 n. 9, 97 S.Ct. 2399. The Fifth Circuit has succinctly stated how the interpretive regulations are to be used:

> To the extent that a district court finds in the interpretations an analogy useful in deciding the case before it, it may rely on the interpretations as persuasive evidence both of Congress's legislative and the Secretary's regulatory intent. At the same time, should a district court find the concepts expressed inapposite to the facts before it, the court is free to engage in its own application of [the exemption] and the pertinent regulations.

*Dalheim v. KDFW–TV*, 918 F.2d 1220, 1228 (5th Cir.1990).

As the employer, Macmillan bears the burden of proving that Shaw is exempt. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Macmillan argued below that Shaw was either an administrative employee or a professional employee. The parties argue the applicability of both provisions on appeal, but because the district court decided this case by finding Shaw an administrative employee, and we conclude that it did not err, we need address only that issue.

Courts generally refer to the defining regulations as having a "long test" and a "short test." *See, e.g., Haywood*, 121 F.3d at 1069. The Secretary's regulation defining an administrative employee, 29 C.F.R. § 541.2, has five parts, § 541.2(a)-(e), most of which have two subparts. This is the so-called long test. At the end, the regulation adds a proviso, the so-called short test, which has only two parts:

> Provided, that an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week ... and whose primary duty consists of the performance of work described in [§ 541.2(a) ], which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all the requirements of this section.

*See also* 29 C.F.R. § 541.214 (indicating proviso is a separate two-part test for "high salaried" employees). The incorporated § 542.1(a) provides in relevant part that the employee's primary duty must "consist[ ] of

... (1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer."[2]

There is no dispute that Shaw was paid a salary of more than $250 per week, so that short test applies to her. For Shaw to be exempt, then, her primary duty must have involved (1) office or nonmanual work directly related to management policies or business operations; and (2) the exercise of discretion and independent judgment. *See Haywood,* 121 F.3d at 1069 (includes salary requirement as third part of test). Shaw does not challenge the district court's finding that her job involved discretion, focusing her arguments only on the finding that her "primary duty" was directly related to Macmillan's management policies or business operations. Shaw makes a three-part attack on the district court's conclusion: First, she asserts the district court clearly erred in finding that she was "ultimately responsible" for the book projects on which she worked. Second, Shaw argues that the district court erred in concluding that she was involved in "major assignments" relating to Macmillan's business operations. And finally, Shaw argues that the district court erred in comparing her duties to the duties of a systems analyst, which job is exempt by regulation. We address these arguments in turn.

In finding that Shaw conducted major assignments directly related to Macmillan's business operations, the district court noted that Shaw "was ultimately responsible for managing entire book projects through the editing and production processes" and that she was "ultimately responsible for both the timeliness and quality of the book." Shaw argues that this is clearly erroneous because her superior was also responsible for the timeliness and quality of the books, so she could not have been "ultimately" responsible. The record shows that the managing editor would be held accountable for the timeliness and quality of the book but that the production editor would also be held accountable. And Shaw was the only person responsible for managing the book projects through the editing process. The managing editor was not involved in the day-to-day management of this process. While the managing editor set the overall schedule, Shaw set the intermediate schedules, delegating work to others and setting deadlines for them. Shaw was responsible for working out deadline problems and went to the managing editor only if there was a problem she could not solve, such as when the conflicting work assignments of multiple production editors had to be re-prioritized so that the more important tasks would be done first. After examining the district court's statements in the context of all the findings and conclusions, we conclude that the district court did not misapprehend the record regarding Shaw's responsibility and place in Macmillan's hierarchy. The district court did not use the term "ultimately" in its findings of fact when it was setting out Shaw's duties and responsibilities; that word appears only in Conclusion of Law No. 18. Perhaps the district court's use of the term "ultimately" could have a broader meaning in that context, but Shaw has not demonstrated that the district court relied upon clearly erroneous findings.

Shaw next argues that the district court erred as a matter of law in concluding that she was an exempt administrative employee because, she asserts, the record does not show that she performed "work directly related to management policies or general business operations of" Macmillan. 29 C.F.R. § 541.2(a). The Secretary has promulgated interpretive regulations in an attempt to shed some light on what this term in the regulations means. In relevant part these interpretive regulations provide:

(a) The phrase "directly related to management policies or general business oper-

---

**2.** We note one aspect of this binding regulation that seems obsolete, namely the $250 per week threshold to whether an employee is "high salaried" and so only subject to the analysis of the "short test." *See* 29 C.F.R. § 541.214. The $250 per week figure was established in February 1975, *see* 40 Fed.Reg. 7092, when the minimum wage was $2.10 per hour and was set to increase to $2.30 at the end of that year, 29 U.S.C.A. § 206 (Historical Note). When the law was enacted, $250.00 identified "high salaried" employees and was a significant factor in determining whether an employee should be exempt. This low threshold has rendered the long test generally inapplicable in today's dollars.

ations of his employer or his employer's customers" describes those types of activities relating to administrative operations of a business distinguished from "production"....

(b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business, as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control....

(c) As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. *The phrase also includes a wide variety of persons who either carry out major assignments in conducting operations of the business,* or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

....

29 C.F.R. § 541.205 (emphasis supplied). These interpretive regulations suggest a dichotomy between "production" and "administrative" jobs. The district court adopted this dichotomy in this case and concluded that Shaw's job fell "squarely on the production side of the line," but that she nonetheless still qualified as an administrative employee. The district court concluded that Shaw's job met the "directly related to" part of the short test because, relying on the interpretive regulations, she "carried out major assignments in conducting the operations of the business." Now Shaw only attacks the district court's conclusion that she carried out such "major assignments." She asserts that this conclusion is wrong as a matter of law.

As it did below, Macmillan argues that the production/administrative dichotomy set out in the interpretive regulations is not applicable in this case, which it characterizes as involving a "white collar" setting. As we have said, the interpretive regulations are to be used to the extent they are helpful analogies to the case at hand. Perhaps the typical example of the production/administrative dichotomy is a factory setting where the "production" employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork. But, as the district court recognized, courts have applied the production/administrative dichotomy to settings quite different from a typical blue-collar/white-collar separation. *See, e.g., Martin v. Cooper Electric Supply Co.,* 940 F.2d 896, 903 (3d Cir.1991) (wholesale-distribution company); *Dalheim,* 918 F.2d at 1230–31 (television news producers); *Reich v. New York,* 3 F.3d 581, 587–88 (2d Cir.1993) (Police Bureau of Criminal Investigations). We need not decide how far the production/administrative dichotomy can be taken before it is no longer a helpful analogy. Because Shaw makes a very limited argument on appeal, we need only decide whether the district court erred in concluding Shaw carried out major assignments for Macmillan.

Without question Shaw did perform major assignments for Macmillan. Her argument that she did not is essentially that she was a small part of a large company: she argues that there is no evidence of the value or relative significance of the book projects on which she worked, that is,

there is no evidence in the record of the number of books published by any of Macmillan's imprints, or the number of book projects managed by Shaw, or the importance of those books to Macmillan, or the marketing success of those books, or the dollar amount of revenue generated by the sales of those books, or the percentage of total revenues represented by the sales of those books. And there is no evidence that any of the books assigned to Shaw were profitable.

Appellant's Brief at p. 42. First, we must reject Shaw's assertion that the profitability

or revenue of the projects on which she worked must be taken into consideration. An employer must be able to determine when it hires an employee whether she is exempt or nonexempt. It would be wholly unworkable for this court to adopt an analysis which required employers to examine the work an employee does after she has finished an assignment and then determine whether she should have been paid overtime. The success or failure of a book could depend largely on the author. And Shaw cites no authority that suggests this type of analysis is required by the FLSA or the regulations.

We also reject Shaw's argument that the number of book projects that she managed must have been a significant percentage of the number of books Macmillan published. The work that a single employee can do is limited, and as a company grows larger and larger, the percentage of the total output represented by each employee's efforts becomes smaller and smaller. Shaw was one of about 50 production editors, which, if all production editors were assigned approximately the same amount of work, would suggest Shaw managed only about 2% of the book projects that Macmillan published while she was working there. (We note that she was one of four production editors working in the Que imprint, so she may well have represented about 25% of that total output.) But that small percentage means nothing more than that Macmillan is a large company employing many people to do the same work Shaw did. And we are confident that the hours Shaw spent managing the projects was only a small percentage of the hours of work on the project devoted by all employees. The district court did not err in concluding on this record that the entire book projects Shaw managed were "major assignments." Nothing in the regulations suggests that "major" equates only to assignments that are significant relative to the size of the company as a whole. Indeed, the regulations specifically provide that employees can carry out major assignments "even though their assignments are tasks related to the operation of a particular segment of the business." On this record the book projects on which Shaw worked were "segment[s] of the business" and Shaw's task of managing the entire project through the editing process was a "major assignment." The district court did not err in so concluding.

Finally, Shaw claims that the district court erred as a matter of law by finding that her job was similar to a "systems analyst," which is exempt by regulation. The district court concluded:

This primary duty of a production editor is analogous to the administrative duties of an exempt systems analyst, which position is described at 29 C.F.R. § 541.205(c)(7) as: "concerned with the planning, scheduling, and coordination of activities which are required to develop systems for processing data to obtain solutions to complex business, scientific, or engineering problems of his employer or his employer's customers."

Dist. Ct. Conclusion of Law No. 18. Shaw now points out the numerous differences between her job as a production editor and the systems analyst described by the regulations. But these arguments are unavailing. The district court did not entirely premise its conclusion that Shaw was exempt because she was closely analogous to an exempt systems analyst. The district court was being thorough by adding one more reason to support the already convincing conclusion that Shaw was exempt. Certainly there is no error merely because the analogy is not precise; the district court did not suggest it was. Indeed, in *Haywood* this court found it worth noting that the employee was "somewhat analogous" to one of the occupations that are exempt by regulation, even though the analogy was far from dispositive in that case. 121 F.3d at 1072.

### III. Conclusion

For the reasons stated above, the district court's conclusion that Shaw was exempt from the time-and-a-half provisions of the FLSA as a bona fide administrative employee is

AFFIRMED.