Anthony PISCIONE, Plaintiff–
Appellant,

v.

ERNST & YOUNG, L.L.P.,
Defendant–Appellee.

No. 98–1923.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 1, 1998.

Decided March 23, 1999.

530

Andrew P. Wirick (argued), Hume, Smith, Geddes, Green & Simmmons, Indianapolis, IN, for Plaintiff–Appellant.

Lee B. McTurnan, McTurnan & Turner, Indianapolis, IN, Bruce M. Cormier (argued), Ernst & Young, Washington, DC, for Defendant–Appellee.

Before COFFEY, KANNE, and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

Anthony Piscione appeals the district court's decision granting the motion for summary judgment made by Ernst & Young, L.L.P. ("Ernst & Young"), his former employer. Piscione sued Ernst & Young under the Fair Labor Standards Act ("FLSA") for failure to provide him with overtime pay. He argues that the district court erred in granting summary judgment because it failed to consider evidence he believes demonstrates that he does not fit within one of the statutory exemptions relieving employers from their statutory duty to pay overtime to their salary basis employees. Upon examination of the record, we conclude that the district court properly granted Ernst & Young's motion for summary judgment in light of the evidence before it and, therefore, affirm its decision.

## I. History

Ernst & Young employed Piscione between 1991 and 1996 as a consultant in its Human Resources Consulting Group located in Indianapolis, Indiana. During this time, Piscione, a careertrack employee,

worked in the defined benefit plans and defined contribution plans practice groups. Piscione maintained a solid work history while employed by Ernst & Young. During his tenure, he received two promotions: the firm promoted him from the position of staff consultant to that of senior staff consultant and later to that of manager. Ernst & Young paid Piscione an annual salary. During the first eight months of his employment, Piscione received straight overtime pay for the hours he worked in excess of forty hours per week. After that period, he did not receive any overtime compensation.

The parties dispute the nature of Piscione's duties. According to Ernst & Young, Piscione's duties, while working in the defined benefits plans practice group, included managing and administering several multi-million dollar benefit plans in which thousands of individuals participated. He also served as the day-to-day contact person for twenty plans, which ranged in size from ten to 3,500 participants. In these capacities, he performed actuarial valuation, prepared government filings, and calculated benefits for separate participants. When Ernst & Young transferred him to the defined contributions area, Piscione assumed client management responsibility for fifteen multi-participant plans. He also performed periodic valuations and compliance testing for thirty plans, ranging in size from ten to 6,000 participants. In order to perform these duties, Piscione had to apply varying plan provisions to many transactions, perform complex calculations using the company's computers, account for variances and imbalances that arose in the plans, and ensure that the plans comported with the Internal Revenue Code. According to Ernst & Young, Piscione "worked independently, actively, and creatively in addressing client needs." He examined client data for problems, proposed solutions to clients, and advised them about their plans. In addition, he supervised junior employees and evaluated potential employees during the hiring process. He also pursued professional certification and met the firm mandated continuing education requirements.

Piscione does not disagree that while employed by Ernst & Young he was involved in benefits calculation, actuarial valuation, government filings, answering client questions, period valuations, compliance testing, and other projects, including training and supervising other employees. What he does disagree with, however, is Ernst & Young's assertion that these activities required independent thought or creativity on his part. He argues that he prepared reports by merely plugging numbers into formulas. The time he spent with the clients involved asking basic plan questions, not proposing solutions to problems he allegedly found while analyzing their data. He describes his participation in the training of other employees as centering only on "rote tasks performed by entry level persons." Piscione also characterizes his supervision of employees as involving very little of his time. He says that this responsibility did not become part of his job until June 1996. He claims he never interpreted the Internal Revenue Code or Internal Revenue Service regulations. Rather, he asserts that his superiors made any necessary determinations and decisions. In sum, he characterizes his responsibilities as more akin to those of a cashier in retail sales than those of a professional or administrative employee.

In September 1996, Piscione resigned from Ernst & Young. The next month, he filed this suit claiming Ernst & Young violated the FLSA by classifying him as an exempt employee and, thereby, not paying him time and one-half overtime for the period beginning nine months into his employment and ending when he left the firm. Ernst & Young filed a motion for summary judgment claiming that Piscione fell within either the FLSA's administrative or professional employee exemption or both. Even though Piscione submitted his own affidavit, contesting Ernst & Young's motion, the district court concluded that

Piscione failed to identify any genuine material issue of fact. It also found that Ernst & Young had sufficiently established Piscione was exempt under both statutory exceptions. Piscione appeals the district court's decision.

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*. *See Tesch v. County of Green Lake*, 157 F.3d 465, 471 (7th Cir.1998). Summary judgment is proper when "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, we construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat such a motion.

## III. Analysis

Piscione urges us to reverse the district court's decision granting summary judgment to Ernst & Young because he believes the court failed to consider evidence demonstrating that he does not come within one of the statutory exemptions to the FLSA requirement that employers must pay overtime to employees who work in excess of forty hours in a week. We, however, agree with the district court's conclusion that Piscione failed to present

genuine issues of material fact regarding his contention that he could not come within either the administrative or professional exemption. Thus, as a matter of law, based upon the facts construed in a light most favorable to him, we agree with the district court's conclusion that Piscione did fall within the professional and administrative exceptions under the FLSA, thus, entitling Ernst & Young to summary judgment.

### A. Piscione's Affidavit Versus His Deposition Testimony

In arguing that genuine issues of material fact exist in the record, Piscione presented the district court with his own affidavit. This affidavit contradicts Piscione's deposition testimony, upon which Ernst & Young relied, in part, for its motion for summary judgment.

■ It is a well-settled rule of this Court that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition, *see Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir.1994), and, in turn, defeat a defendant's motion for summary judgment. *See Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 379 (7th Cir.1995); *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995). "Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions." *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir.1985). Thus, when a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit. As we have noted, "[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir.1993). When a "deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the state-

ment in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell*, 51 F.3d at 67–68 (citing *Slowiak*, 987 F.2d at 1297 (additional citations omitted)).

■ In this case, Piscione attempts to create genuine issues of material fact by referencing statements in his affidavit, which he filed after Ernst & Young moved for summary judgment. These statements, however, contradict those he made earlier during his deposition. There is no indication that the statements in the deposition resulted from mistake, confusion, or lapse of memory. Thus, in those instances when Piscione's affidavit conflicts with his deposition testimony, the deposition testimony controls.

## B. The Fair Labor Standards Act

■ Under the FLSA, 29 U.S.C. § 201 *et seq.*, employers must pay their employees at least one and a half times their regular wages for the number of hours worked that exceed forty in a given week. 29 U.S.C. § 207(a)(1). However, employees "employed in a bona fide executive, administrative, or professional capacity" are exempt from this requirement. 29 U.S.C. § 213(a)(1). Ernst & Young alleges that Piscione comes within either the administrative or professional exemption. Congress delegated to the Secretary of Labor the authority to define the scope of this section and the exemptions. *Id.* Thus, the Secretary's regulations have "the force and effect of law." *Cf. Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). While we are not bound by interpretative regulations, we may rely upon them to the extent they add

in our assessment of a case. *See Shaw v. Prentice Hall Computer Publ'g, Inc.*, 151 F.3d 640, 642 (7th Cir.1998).

The Secretary has defined a long test, *see* 29 C.F.R. §§ 541.2(a)-(e) (administrative) & .3(a)-(e) (professional), and a short test, 29 C.F.R. § 541.214 (administrative) & .315 (professional), to determine whether an employee falls within the administrative or professional exemption. The short test may be used only if the employee is "compensated on a salary or fee basis at a rate of at least $250 per week exclusive of board, lodging, or other facilities." 29 C.F.R. § 541.315 (professional); *see also* 29 C.F.R. § 541.214 (administrative). Neither party disputes that Piscione's yearly salary, which varied from $35,722.95 to $51,560.08 and was paid on a semi-monthly basis, meets this requirement. Therefore, we focus our analysis on the short tests for both the administrative and professional exemptions.

■ Under both tests, the employer bears the burden of establishing whether an employee fits within an exemption. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). To establish that an employee falls within the administrative exemption, an employer must demonstrate that the employee meets three conditions. *See* 29 C.F.R. § 514.214.[1] First, the employee must be paid on a salary basis, as defined in the regulations. *Id.* Second, the employee's primary duty must involve office or nonmanual work "directly related to management policies or general business operations." *Id.* Finally, the employee's work must "include[ ] work requiring the exercise of discretion and independent judgment." *Id.*; *see also Haywood v.*

---

1. Section 541.214 provides:

[A]n employee who is compensated on a salary or fee basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities, and whose primary duty consists of . . . the performance of office of nonmanual work directly related to man-

agement policies or general business operations of the employer or the employer's customers . . . where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment.

29 C.F.R. § 514.214.

*North Am. Van Lines, Inc.*, 121 F.3d 1066, 1069 (7th Cir.1997).

Alternatively, for Piscione to come within the professional exemption, Ernst & Young must establish that he meets a test similar to that governing the administrative exemption. *See* 29 C.F.R § 514.315.[2] First, the employer must compensate the employee on a salary basis, as defined in the regulations. *Id.* Second, the employee's primary duty must "consist[ ] of the performance of work requiring knowledge of an advanced type in a field of science or learning . . . ." *Id.* Finally, the employee's responsibilities must also include "work requiring the consistent exercise of discretion and judgment." *Id.*; *see also Klein v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 990 F.2d 279, 283 (7th Cir.1993).

The tests for both the administrative and professional exemptions are similar with one exception. Both require the employee to be paid on a salary basis. Both also require the employee to engage in activities requiring the exercise of discretion and judgment, except that the administrative test notes that the employee must exercise *independent* judgment. The administrative exemption test, however, requires that an employee's primary duty involve office or nonmanual work "directly related to management policies or general business operations," while the professional exemption test mandates that an employee's work require advanced knowledge in a field of science or learning. For simplicity, we discuss the two overlapping prongs of each test simultaneously.

## C. Piscione's FLSA Claim

Ernst & Young asserts that no issues of material fact exist in this case. It claims that Piscione's affidavit conflicts with his own deposition testimony in four key areas that mirror the legal tests under which we consider his FLSA claim. Ernst & Young claims there is no issue with regard to: (1) whether Piscione was a salary basis employee under FLSA; (2) whether Piscione's job required him to exercise discretion and independent judgment; (3) whether Piscione's primary duties directly related to the management policies or general business operation of Ernst & Young or its clients; and (4) whether Piscione's primary duties required advanced knowledge. The district court concluded that Piscione had not established genuine issues of material fact with regard to these points. We agree with its assessment.

### 1. Piscione Was a Salary Basis Employee

Under both the administrative and professional exemption tests, an employer must prove that the employee in question is paid on a salary basis. The regulations provide that an employee is paid on a salary basis if "under his employment agreement he regularly receives each pay period . . . a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or the quantity of the work performed." 29 C.F.R. § 541.118(a). If an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee is not considered to be on a salary basis. *See Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 908, 137 L.Ed.2d 79 (1997).

Piscione argues he cannot be within an exemption because the possibility existed that Ernst & Young would dock his pay

---

**2.** Section 541.315 also requires employees to be "compensated on a salary or fee basis at a rate of at least $250 per week exclusive of board, lodging, or other facilities." It also provides:

"[T]he requirements for exemption . . . will be deemed to be met by an employee who receives the higher salary or fees and whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning . . . which includes work requiring the consistent exercise of discretion and judgment. . . ."

29 C.F.R. § 541.315.

for partial day absences. In his affidavit, he stated: "My recollection is that while I was employed at Ernst & Young, if I were to record substantially less than eight hours for my work day, and had no vacation or other time available, I would be docked in pay for the shortfall on all such days." This statement contradicts his July 27, 1997, deposition. In that deposition, he was asked whether it was true that Ernst & Young "never threatened" to "deduct any money from your pay because you engaged in [personal] errands" around his lunch hour, and Piscione answered "Correct." In addition, he noted that he had no expectations that his pay would be docked for absences if he had no vacation time remaining for the year and took less than a full day of vacation.

Q: Do you have any reasons to believe that if you had taken a less than full day of vacation at a point during which you no longer had any vacation time accrued that Ernst & Young would have deducted money from your salary?

A: I wouldn't expect that they would have deducted time for that, depending on the circumstances. I would have taken it to my manager to get some sort of approval.

Because of the dissonance between the deposition testimony and subsequent affidavit, the district court correctly determined that Piscione's deposition testimony trumped the statements he made in his affidavit. The record contains no other evidence supporting the assertions Piscione made in his affidavit. Thus, no genuine issue of material fact exists with regard to whether Ernst & Young violated the no-docking rule with regard to its treatment of Piscione for partial day absences. Therefore, this prong of both the professional and administrative exemptions is satisfied.

**2. Piscione's Duties Required the Exercise of Discretion and Independent Judgment**

Piscione also argues that factual disputes exist as to whether his position at Ernst & Young required him to exercise discretion or independent judgment. Piscione, again, relies solely upon his affidavit to show that this genuine issue of material fact exists. In his affidavit, he asserts that his responsibilities did not require the exercise of discretion and independent judgment. His deposition testimony, however, demonstrates that he helped to improve client services, acted as a supervisor for several employees, and was responsible for several clients. These responsibilities would have required him to exercise discretion and independent judgment.

The regulations explain that discretion and independent judgment, as they relate to the administrative exemption, involve

[T]he comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered .... [it] implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

29 C.F.R. § 541.207. In addition, "the discretion and *independent* judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." 29 C.F.R. § 541.207(d)(1). While the regulations require the employee to exercise *independent* judgment, the term does not require this judgment to be made in isolation. *See Dymond v. United States Postal Serv.*, 670 F.2d 93, 96 (8th Cir.1982). "Even though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of discretion and independent judgment as the terms are defined for the administrative employee exemption." *Id.* Supervisory and training responsibilities, for example, are evidence

of duties that are administrative in nature. *See Marshall v. Sec. Bank & Trust Co.*, 572 F.2d 276, 278 (10th Cir.1978). In the context of the professional exemption, the regulations require only the exercise of discretion and judgment and explain that "[p]urely mechanical or routine work is not professional." 29 C.F.R. § 541.305. In this case, we find it appropriate to discuss the discretion and judgment aspects of both tests together because we agree with the district court that Piscione exercised discretion and independent judgment. The use of *independent* judgment necessarily implied the use of judgment generally. *See Reich v. Wyoming*, 993 F.2d 739, 743 (10th Cir.1993) (finding that game wardens exercised discretion and independent judgment and, thus, met the Secretary's regulations regarding the professional exemption).

Again, based upon the statements in his affidavit, Piscione contends that factual disputes exist as to whether his work required the exercise of discretion and independent judgment. In his affidavit, Piscione characterized his work as devoid of any need for judgment or discretion. He claimed that he did not engage in the development of "methodologies" because Ernst & Young used the term to describe how he "and many other low level employees would periodically make suggestions to clients to improve their methods," rather than according to its ordinary meaning. This type of activity, he contended, did not require the exercise of discretion or independent judgment. He also denied possessing any supervisory authority that would have called for him to exercise discretion and judgment. He stated that while Ernst & Young had informed him that he would supervise junior employees, this duty would not have taken effect until June 1996.[3] He added: "my supervisory responsibilities were very limited—I could not hire or fire, and spent very little time directing the work of others." He noted

that "I did very, very little training at any point in time, and only for certain rote tasks performed by entry level persons...." With regard to his responsibilities concerning clients, he claimed that he did not have any and "used the term 'client management' simply because some clients did not even speak to other employees in my group—there was no 'client management' in terms of orchestration of a plan or similar control on my part." He also asserted that his contact with clients was "overstate[d]."

During his deposition, however, Piscione presented a contrasting description of the need for discretion and independent judgment in his position. For example, he admitted to making improvements in the efficiency of Ernst & Young by developing methodologies to improve client services and improving realization rates by providing junior employees with more responsibility. He did not challenge the meaning of the term "methodologies," but rather, freely admitted that he developed them to "[i]mprove services and try to save time." These activities suggest Piscione used discretion and independent judgment because these projects would naturally appear to require "the comparison and the evaluation of possible courses of conduct and ... making a decision after the various possibilities have been considered," as contemplated by the regulations. *See* 29 C.F.R. § 541.207(a). While Piscione stresses that he consulted with someone else in these matters, such consultations do not relieve him from the decision-making involved. We are cognizant of the reality that many individuals who exercise discretion and independent judgment often do so after consultation with others. Consultation implies an exchange of views or a request for advice; it does not mean an abdication of an individual's own discretion or independent judgment. Consulting

---

**3.** In his brief, Piscione argues that he never obtained supervisory responsibilities because he would not have assumed the duty until

September 1996, a month after he left the employment of Ernst & Young.

with others supplements the information an individual has in order to reach a final judgment. In performing these activities, Piscione exercised discretion and independent judgment.

His deposition and resume also demonstrate that his responsibilities included supervising several employees, which would necessarily require him to exercise discretion and independent judgment. In his 1996 resume, Piscione stated that he was "[r]esponsible for the supervision and development of 7 employees" from August 1994 to the present. In his deposition he affirmed that his resume accurately reflected his experience at Ernst & Young. Although he denied this responsibility during his deposition, he admitted during that same deposition that before July 1996 he had provided guidance to employees from whom he had requested assistance for specific projects and acknowledged giving assignments to other employees. When asked whether it was true that he trained junior level employees "so that an increased amount of work [could] be given to them," he responded "yes." Finally, he answered affirmatively when asked whether his training required him to make "a judgment of what—as to what certain junior employees could do and the rate at which you could teach them to do it." These comments echo Piscione's self-evaluation performance reviews in which he characterized himself as spending time managing other employees and being "deeply involved in training a new hire."

Piscione also made several additional admissions demonstrating his supervisory responsibilities. For example, he set priorities for the other members of his team. He judged the abilities of his junior employees to determine how long it would take him to teach them the necessary skills associated with these improvements. He also stated that he, along with others in the firm, evaluated potential employees after interviewing them and then making recommendations to hire them. The deposition testimony and resume demonstrate that Piscione did engage in the supervision of junior employees in a way that was more than minimal. These duties, by his own admission, required the exercise of discretion and independent judgment.

Examination of Piscione's deposition testimony leads us to conclude that he engaged in several activities that necessitated him also to use discretion and make independent judgments with regard to his duties advising and counseling clients. For example, he testified that he had to communicate due dates to his clients based on his judgment as to how long it would take to finish the particular project. His duties associated with conducting actuarial valuations and compliance testing required him to summarize problems in clients' accounts, inform the clients about these problems, and suggest solutions. These duties clearly demonstrate the need for him to exercise discretion and independent judgment. Moreover, Piscione wrote to clients telling them that they should contact him with their questions about their accounts. These duties remained consistent throughout his tenure in both the defined benefits plans practice group, which focused on problems associated with data provided by clients, and the defined contributions plans practice group, which focused on inconsistencies he found after performing periodic valuations and compliance testing. He also noted how he had helped to streamline the process by which clients supply data. All of these duties involved choosing between various possibilities and then making a decision to convey the ultimate choice to the client. While we accept his assertions that he often consulted with other employees about some decisions, he noted that he did not receive immediate supervision so long as he met the clients' expectations. Thus, it seems clear from his deposition testimony that he exercised discretion and independent judgment with regard to his responsibilities toward clients.

The duties Piscione identified in his deposition are similar to those the Eighth

Circuit found met the administrative exemption test. *See Spinden v. GS Roofing Prod. Co., Inc.*, 94 F.3d 421, 423–24, 428–29 (8th Cir.1996), *cert. denied,* 520 U.S. 1120, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997). Like Piscione, the plaintiff in *Spinden,* downplayed his job responsibilities as being primarily "number crunching" and "clerical work." *Id.* at 424. In examining the plaintiff's resume and deposition testimony, the Eighth Circuit found the plaintiff's activities, including his duties relating to reconciling payroll bank accounts, auditing of payroll earnings and deductions, developing systems and programs to streamline office procedures, making recommendations to management, and making recommendations about personnel, as well as utilizing his cost variance analysis skills, actually required him to exercise discretion and independent judgment. *Id.* at 423–24. Once the tension between the affidavit and deposition testimony is properly resolved, no issue of material fact remains. We, like the district court, conclude that Piscione's skills are similar to those of the plaintiff in *Spinden.* Thus, Ernst & Young established that Piscione meets this prong of both the administrative and professional exemption tests.

### 3. Piscione's Primary Duties Directly Related to the Policy and General Business Operations of Ernst & Young

 In addition to meeting the salary basis and discretion and independent judgment requirements, to qualify for the administrative exemption, an employee's duties must "consist[ ] primarily of office or nonmanual work directly related to management policies or general business operations." *Haywood,* 121 F.3d at 1071. Just because an employee may spend a significant portion of his time engaged in ministerial or routine tasks does not necessarily prevent the application of the administrative exemption. *Cf. York v. City of Wichita Falls,* 944 F.2d 236, 242 (5th Cir. 1991) (making the same point with regard

to executive employees). To determine whether an employee comes within the exemption, we must first ascertain whether the employee's work is office or nonmanual work. *See Haywood,* 121 F.3d at 1071. Neither party disputes the fact that Piscione's duties focused on office or nonmanual work. Next, we must determine that Piscione's primary duties directly related to the policy or general business operations of Ernst & Young, as opposed to relating only to production or sales work. *See id.;* 29 C.F.R. § 541.205. Thus, we must examine closely Piscione's duties while employed by Ernst & Young.

 Piscione contests the district court's conclusions that no factual disputes exist regarding the specific responsibilities of his job, that his primary duties involved activities other than production, and that his primary duties were of substantial importance to Ernst & Young. Upon examination of his affidavit and deposition testimony and an application of the regulations and their illustrations, we agree with the district court that Piscione's primary duties directly related to the policy and general business operations of Ernst & Young.

In his affidavit, Piscione claimed that his duties did not directly relate to Ernst & Young's policies or general business operations or those of its clients because his responsibilities were more like those of "a cashier in retail sales" than an administrator. Piscione characterized his role as minimal with regard to his work with tax laws and his duties involving the valuation and analysis of customers' pension plans. In describing his duties with regard to the defined benefits practice, Piscione stated, in his affidavit, that he spent the vast majority of his time applying company formulas, gathering and placing data in reports, taking numbers and placing them in the appropriate spots on government forms, and answering "basic questions about the plan like eligibility for participation, eligibility for retirement, etc." He

similarly characterized his work in the defined contributions plans practice group as involving merely summarizing data, updating the database, reconciling reports, and using the company formula developed by his supervisors to conduct comparisons required by the Internal Revenue Code. He claimed that he did not establish due dates for projects. Piscione also portrayed his client management duties as minimal. From these descriptions, he would have us conclude that his duties did not affect the policies or general business operations of Ernst & Young or that of its clients.

His deposition, however, paints the portrait of an employee whose duties included tasks that influenced the business operations and policies of Ernst & Young's clients, as well as the business operations and policies of the firm itself. His duties with regard to clients were substantial. He managed at least fifteen clients at a given time. In his deposition he indicated that while he had to abide by general due dates prescribed by his supervisors, he adjusted them based on his workload and communicated these changes to his clients. According to his deposition testimony, he wrote to clients indicating problems and suggesting solutions. In addition, he made suggestions to clients regarding how they could improve their efficiency. He also served as the primary contact for several clients while working in the defined contribution plans practice group. He instructed clients to contact him with their questions. The deposition testimony indicates that Piscione's duties involved more client responsibilities than his affidavit suggests. These duties clearly influenced the way in which the clients interacted with Ernst & Young and, potentially, their internal operations regarding their benefits and contribution plans.

In the deposition, Piscione also noted that he influenced Ernst & Young's business operations and policies. For example, he stated that he helped the firm adopt a voice response system.

Q: And you played a significant role in that implementation of the use of the voice response system, correct?

A: I did. I probably—I had—at the time I set those things up, I was able to use other software. I don't recall if we used a spread sheet or Foxpro, which was a data-based software, to read that information and change the format in the way that we needed it to be in. I did play a large role in that process, at least completing the work and helping to design what we wanted to accomplish.

Q: So you, in fact, assisted in the design, the visualization of how that project worked?

A: Yes.

He also stated in his deposition that he developed methodologies to "improve services and try to save time." In fact, he specifically stated "I assisted in coming up with ways to improve client services." He also organized the review process for 130 plans associated with an individual corporation, which required the use of organization and planning skills. Also, in the deposition, he responded affirmatively to questions regarding whether his self-evaluation statements about the improvements he made in services were accurate. His self-evaluation stated: "I have been able to demonstrate to clients mainly in face-to-face meetings changes I have made to the allocation process or in information delivered to the client that has either saved the client time and resources or has improved the timeliness of our processing." Although his deposition and affidavit mirror each other with respect to Piscione's consistent protestation that he did not interpret the Internal Revenue Code provisions, but rather used tests others devised, the majority of his statements taken together suggest that he did have significant managerial responsibilities while employed with Ernst & Young. Because the statements in his affidavit that characterize his duties as minimal and not directly related

**540**

to the policies or general business operations of Ernst & Young conflict with those he made earlier in his deposition, the deposition testimony controls in our analysis.

With this conflict settled, we address Piscione's assertion that his duties involved merely production work. The regulations clearly state that activities such as production and sales work are not included in this exemption. *See* 29 C.F.R. § 541.205(a). Piscione, in his deposition, affirmed that his work did not involve any sales components. However, he asserts to us that the district court should have determined that his primary duties involved merely supplying a product to Ernst & Young clients. While he would like us to believe his work was product-oriented, he presents no evidence or argument as to why this conclusion should be reached, and his deposition testimony contradicts this assertion. It is true that he supplied customers with reports and filed government forms that in themselves could be considered "products"; however, accepting that argument would mean that any consultant's or analyst's report would be a product. This result would directly contradict the manner in which the regulations classify these individuals. The regulations specifically state that advisory specialists and consultants meet the "directly related to" test. *See* 29 C.F.R. § 205(c)(5).[4] Therefore, Piscione's duties at Ernst & Young were distinguishable from those of production or sales work excluded from the exemption.

■ With the nature of his duties established, we, next, must determine whether these responsibilities constituted his *primary* duties. In his affidavit, Piscione asserted that he spent the greatest percentage of his time consumed by duties involving menial or routine tasks. In his deposition, however, he contradicted this

assessment. For example, he affirmed that he spent the majority of his time while in the defined contribution plan practice group performing complex activities linked to valuation and compliance testing. The regulations define "primary duty" in the context of the administrative exemption by incorporating the definition of the term as it relates to the executive exemption. *See* 29 C.F.R. § 541.206(b). The regulations state:

> A determination of whether an employee has [administration] as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the [administrative] duties is a useful guide in determining whether [administration] is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in [administration] would have [administration] as his primary duty. *Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in [administrative] duties, he might nevertheless have [administration] as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the [administrative] duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.*

29 C.F.R. § 541.103 (emphasis added). As the regulations note, time alone is not

---

4. The regulations provide:
 The test of "directly related to management policies or general business operations" is also met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors,

claim agents and adjusters, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others.

29 C.F.R. § 205(c)(5).

the only relevant factor we must consider. An "employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time." *Reich*, 993 F.2d at 742.

Piscione's duties, as described in his deposition testimony, appear to be ones that would be of "principal importance" to Ernst & Young. In his affidavit, Piscione presented the district court with a percentage-based allocation of his time for specific duties. Even from these statements, it is clear that he spent most of his time engaged in benefit calculations, actuarial valuations, and periodic valuations. His deposition testimony described these duties as involving greater client management responsibilities than the short summary in his affidavit did. It also described him as engaging in activities to improve efficiency in these areas. Thus, Piscione seems to have spent more than fifty percent of his time engaged in administrative duties. Even if the amount were less than fifty percent, Piscione's duties as evaluated under the regulatory factors would also be considered primary. His client contact and efficiency changes would be of great importance to Ernst & Young. He also exercised discretionary powers, *see* Part III.C.2., and admitted in his deposition that he received very little supervision. Thus, Piscione's duties that involved more than menial or routine tasks were clearly primary.

Next, the regulations consider whether an employee's primary duties are of "substantial importance" to the employer in evaluating whether they directly relate to the policies or business operations of the employer. *See* 29 C.F.R. § 541.205(a). As the regulations explain, the exemption "is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole," but includes those whose

> work affects policy or whose responsibility it is to execute or carry it out ... [including] persons who either carry out

major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business. 29 C.F.R. § 541.205(c). Piscione does not really dispute that the work described by Ernst & Young and the district court was of substantial importance. Rather, he argues that he did not engage in such activities. Examining his deposition testimony, however, reveals that he did engage in them. Piscione testified during his deposition that he served as the primary contact for at least fifteen clients. He advised them of problems with their accounts, suggested solutions, and proposed ways for them to streamline the manner by which they provided data. He also testified that he helped make improvements in data collection by helping to design the voice system.

His duties were similar to those this Court has determined come within this exemption. In *Haywood*, we found that an employee who negotiated with clients and served as the sole contact of many clients provided services that while perhaps "ancillary" were "nevertheless important to the success of the firm." 121 F.3d at 1072. Like the employee in Haywood, Piscione served as the primary contact for clients' concerns and discussed due dates as well as data delivery methods with them. These projects, while they may have only affected a portion of Ernst & Young's business, serve as examples of how Piscione clearly impacted the firm's business operations and that of their customers.

In Shaw, we held that a production manager performed major assignments for her employer, even though she asserted that she was only a small part of a large company and that the number of projects she managed was not a significant percentage of her employer's business operation. 151 F.3d at 644–45. This employee managed individual books through the production process and was responsible, along with

her supervisor, for the timeliness and quality of the finished book. *Id.* Piscione's duties at Ernst & Young were similar to those of the employee in Shaw. While responsible for only some of the firm's clients, Piscione was responsible for meeting due dates, summarizing results and analyzing them, and communicating these summaries with any resulting problems and his suggested solutions to these specific Ernst & Young clients. Piscione served as the clients' primary contact with the firm, making his responsibilities a key factor in how the clients viewed Ernst & Young. In turn, these responsibilities were central to Ernst & Young's dealings with these clients. Like those of the employee in *Shaw*, Piscione's administrative duties constituted major assignments of principal importance to the employer.

Comparing Piscione's duties with the hypothetical employees used as illustrations in the regulations also clearly demonstrates that his primary duties directly related to the policies or general business operations of Ernst & Young. The regulations provide several illustrations of employees whose primary duties are related to the policies or general business operations of their employer and, thus, fall within the administrative exception. As the district court concluded, Piscione's duties parallel these examples. For example, tax consultants are exempt under this exception. *See* 29 C.F.R. § 541.205(c)(1). The district court concluded, and we agree, that Piscione's work entailed components similar to those in which a tax consultant engages. Although Piscione would have us believe he merely plugged numbers into formulas derived from the Internal Revenue Code by others at Ernst & Young, he testified in his deposition that as part of his continuing education requirement he attended tax seminars to stay abreast of changes in the tax law. He applied the Internal Revenue Code provisions to clients' accounts. If problems arose in the accounts he supervised, he sent letters with potential solutions to clients and asked them to address questions to him.

In this respect, Piscione's duties included activities similar to a tax consultant who the Secretary has concluded come within the exemption.

The regulations also provide an example of how individuals who have the same general job title may come within an exemption depending upon the responsibilities of their work. *See* 29 C.F.R. § 541.205(c)(3). In this example, a statistician who tabulates data would not be within the administrative exemption, while a statistician who engages in analysis and makes conclusions that affect financial, merchandising, or other policies would come within the exemption. *Id.* These examples describe the extremes. *Id.* Piscione would have us believe he was an individual who merely tabulated data, like the regulation's hypothetical statistician who would not fall within the administrative exemption. His deposition testimony presents a picture of an employee who does more than merely tabulate data, however. The description of his duties in this testimony seems more like that of an employee who "makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial, merchandising, or other policy," 29 C.F.R. § 541.205(c)(3). As such an individual, "clearly he is doing work directly related to management policies or general business operations." *See id.*

■ For example, among his duties he performed period valuations. While he claims the process is like "balancing your checkbook," he had to perform the operations for plans that included up to 6,000 participants, making it more like balancing 6,000 checkbooks. As part of the process, discrepancies would often result, and he would have to determine why they arose. He would then communicate this conclusion to the client and tell the client what to do to rectify the problem. This description is more akin to that of a statistician engaged in analysis than a statistician who serves only in a data entry capacity. The

analogy does not need to be perfect; the position needs only to be "somewhat analogous" to an occupation exempted in the regulations. *See Shaw*, 151 F.3d at 645; *Haywood*, 121 F.3d at 1072. As such, Piscione's duties appear to be similar to those of an individual whom the regulations clearly place within the administrative exemption.

Therefore, we find that the district court correctly concluded that Piscione's work was "directly related to management policies or general business operations." He engaged in activities that consisted primarily of office or nonmanual work. These activities constituted his primary duties and clearly affected the policies of both Ernst & Young and its clients. His work required him not only to collect and enter data, but also to analyze it and provide clients with suggestions about how to solve any problems that arose. Therefore, Piscione qualifies for the administrative exemption.

**4. Piscione's Primary Duties Required Advanced Knowledge**

█ Piscione's responsibilities also qualify him for the professional exemption. For the professional exemption, in addition to meeting the salary and the exercise of discretion and judgment prongs, the employee's primary duty must "consist[ ] of the performance of work requiring knowledge of an advanced type in a field of science or learning ..." 29 C.F.R. § 541.315(a). First, we must determine whether Piscione's responsibilities required advanced knowledge. A relevant academic degree serves as prima facie evidence of the possession of professional training. *See* 29 C.F.R. § 541.301(e)(1). Work that comes within this classification is that which is "predominately intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work." 29 C.F.R. § 315(a). Even if an employee's responsibilities require her to engage in some routine work, the position may be classified as coming within the

professional exemption. For example, an employee may be required to collect information, but would still be within the professional exemption if he had to interpret that data as well. *See Reich*, 993 F.2d at 742. If the employee's duties require advanced knowledge, we must also evaluate whether these responsibilities constituted his primary duties.

In his affidavit, Piscione asserted that no advanced knowledge was necessary for his job, characterizing his primary duties as engaging in routine tasks. He asks us to accept his assessment for two reasons. First, he argues that his duties required no higher education because at least two employees at Ernst & Young held the same position he did without having college degrees. Second, he attempts to characterize his duties as requiring no advanced knowledge regardless of the education of his fellow employees. The description of his duties, in his affidavit, portrays a job with few, if any, intellectual challenges. For example, Piscione characterized his duties involving period valuations as merely "receiving the[ ] signals" from a computer program and being "akin to balancing one's checkbook." With regard to his responsibilities over plan changes, he stated that no "reprogramming" of a computer was involved; rather, this responsibility merely required him to choose from a computer-generated menu. He also denied any need to understand and interpret the tax code. He stated that he "never interpreted the Internal Revenue Code or [Internal Revenue Service] Regulations." Instead, he "relied on the knowledge and interpretation of my superiors." In filing reports, he stated that he "simply mov[ed] the numbers from the valuation report—little calculation ·was required." Rather than draft reports his position required him to complete, he characterized his preparation of reports as

> primarily composed of 1) proofreading reports, 2) taking numbers from Lynchval [a computer program used by Ernst

& Young] output produced by my superiors and placing them in appropriate places in the reports, 3) preparing benefit statements in a similar manner (which involved simple formatting and printing), 4) preparing participation listings (which also involved simple formatting and printing), and 5) reconcil[ing] bank statements.

He similarly described his dealings with client documents as routine in nature. It was "very simple," he concluded in his affidavit, "as either the data is contained or it isn't. There's nothing to 'infer'. . . ." Finally, he asserted that with regard to his analysis of client accounts, he did not make actuarial assumptions, but rather merely adopted those used the previous year. Thus, in his affidavit, he painted a picture of a set of employment duties that required no formal post-secondary training and no continuing educational enhancements.

In his deposition, however, Piscione contradicted this generalized characterization. His description of his own educational background, his knowledge of other employees' credentials, and the continuing educational requirements imposed by Ernst & Young illustrate the discrepancy between his affidavit and deposition.

Piscione graduated with honors from the University of Notre Dame obtaining a Bachelor of Science degree. He majored in mathematics and took business courses as well as one computer course. He also affirmed the statement on his resume that he "believed . . . that Ernst & Young was offering [him] a 'challenging career that would utilize [his] mathematics and business background.'"

His deposition testimony weakens the assertion in his affidavit that his job did not require a college degree because other employees at Ernst & Young engaged in the same responsibilities he did without such credentials. He noted that he had no first-hand knowledge of the education of one of the individuals who he stated did not have an education equal to his, but who functioned in the same employment capacity. He added his knowledge of the other employee's educational background came from his memory of an interview he had had with that individual. As we have stated in previous decisions, "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Tyler v. Runyon,* 70 F.3d 458, 469 (7th Cir.1995) (quoting *Hedberg v. Indiana Bell Tel. Co. Inc.,* 47 F.3d 928, 932 (7th Cir.1995)). His assessment of these candidates seems to be only mere speculation.

Piscione's deposition also describes the continuing educational requirements Ernst & Young required an employee in his position to meet. He testified that Ernst & Young required twenty hours of continuing education each year. He stated that he attended courses relating to the recent changes in the Internal Revenue Code because "we needed to be aware of them in some of the work that we were doing." He acknowledged these courses "contributed to [his] professional development."

Q: Would you agree that in your work at Ernst & Young it was important to stay abreast of changes in [regard to changes in the Internal Revenue Code], changes affecting compliance testing?

A: Yes, it was important.

In addition to attending these courses, Piscione admitted that while employed by Ernst & Young he sought further advanced knowledge relevant to his field through his activities relating to becoming a member in the Society of Actuaries. In order to enter this society, Piscione had to complete successfully additional course work and several examinations. As Piscione explained in his deposition, membership in this society means

that you've passed actuarial exams to a certain level, including some exams that involve actuarial, mathematics, interest theory, other exams that relate to provi-

sions of the Internal Revenue Code and regulations. It means you have more responsibility because you can sign items like the Schedule B to Form 5500, so that you're signing your name that you agree the information contained there is accurate as far as that case goes.

He also stated that "I believe the expectation [of Ernst & Young] was that you would at least get to a certain level, which was the enrolled actuary status" if an individual planned on progressing in the defined benefits practice. He agreed that the status indicated certification of professional knowledge. He obtained the level of associate designation and intended to obtain the level of enrolled actuary. The latter distinction would have permitted him to sign the government forms he was already compiling. The deposition testimony regarding the educational requirements stands in opposition to the characterization in his affidavit. In light of his deposition testimony, we agree with the district court's conclusion that Piscione's employment required some level of specialized knowledge.

 With the conflict between Piscione's affidavit and deposition testimony resolved, we turn to determining whether his primary duties required advanced knowledge. While it is true that the determinative factor in analyzing whether an employee falls within this prong is the job requirements rather than the education the employee received, see *Dybach v. Florida Dept. of Corrections*, 942 F.2d 1562, 1565 (11th Cir.1991), we disagree with Piscione's assertion that the district court failed to make this distinction. The regulations explain that the professional exemption "includes those professions which have a recognized status and which are based on the acquirement of professional knowledge through prolonged study." 29 C.F.R. § 541.300. This knowledge is that "which cannot be attained at the high school level." 29 C.F.R. § 541.301(b). This knowledge is "customarily acquired

by a prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.301(d). It is clear from Piscione's deposition testimony along with his resume that Piscione's job depended upon advanced knowledge and the continued development of his understanding of specific knowledge through continuing education seminars, such as those relating to changes in the tax code, and his entry into the Society of Actuaries. Thus, his responsibilities required advanced knowledge.

The responsibilities that require this advanced knowledge constituted Piscione's primary duties. As with the administrative exemption, courts evaluate whether an employee's responsibilities constitute his primary duty based on the importance of the duties, the frequency with which they require the employee to exercise discretion, and the relative freedom of the employee from supervision, as well as the percentage of time the employee spends performing them. *See Reich*, 993 F.2d at 742; 29 C.F.R. § 541.103. In *Reich*, the Tenth Circuit held that duties requiring game wardens to execute a number of complex tasks, which required routine procedures as well as developing plans, setting goals, and making recommendations, were a significant part of the wardens' primary duties for purposes of the professional exemption, even though they spent a significant amount of their time engaged in law enforcement activities. 993 F.2d at 742–43. Piscione's responsibilities, similarly, required both routine and complex tasks. Like the warden's duties, these duties are of relative importance to Ernst & Young because they involve a high level of client contact. Piscione's duties also required him frequently to exercise discretion with regard to the analysis of data, identify problems with client accounts, and communicate solutions to these clients. Finally, Piscione admitted in his deposition that he performed his duties with little immediate supervision. Thus, the duties relevant to the professional exemption appear to come within those the FLSA and

its accompanying regulations contemplate as primary. Therefore, the district court properly determined that Piscione also fit within the professional exemption because his primary duties required advanced knowledge.

## IV. Conclusion

Because Piscione's deposition testimony trumps his affidavit, we agree with the district court that Piscione is exempt from the overtime pay requirement of the FLSA as an administrative or professional employee. He was a salary basis employee; Ernst & Young did not improperly dock or threaten to dock his pay. His job required him to exercise discretion and independent judgment. His duties related to the general business operations of Ernst & Young and its clients. And, his job required advanced knowledge. Therefore, we AFFIRM the decision of the district court granting Ernst & Young's motion for summary judgment.