**Scott SCHERER, Plaintiff,**

v.

**COMPASS GROUP USA, INC., d/b/a/ Chartwells, Defendant.**

No. 03–C–643–C.

United States District Court, W.D. Wisconsin.

Sept. 30, 2004.

Michael P. Macharg, McGuire Woods LLP, Chicago, IL, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Scott Scherer claims that defendant Compass Group USA, Inc., d/b/a/ Chartwells, violated the Fair Labor Standards Act, 29 U.S.C. § 207(a), by not paying him for the 789.75 hours of overtime that he worked during the year that he was employed by defendant. 29 U.S.C. § 207(a) requires employers to pay their non-exempt employees one and one-half their normal hourly rate for all hours worked over forty during a work week. Now before the court is defendant's motion for summary judgment. Defendant argues that plaintiff is subject to the Act's "white collar" exemption, under which an employer is not required to pay overtime wages to employees "employed in a bona fide executive, administrative or profes-

sional capacity."[1] 29 U.S.C. § 213(a)(1). Jurisdiction is present. 28 U.S.C. §§ 1331.

Defendant's motion will be granted. Defendant has adduced evidence showing that plaintiff was paid a weekly salary in excess of $250, his primary duty was the management of the Commons kitchen, which was a customarily recognized subdivision of the defendant's catering department; and he supervised two or more employees regularly. For the most part, plaintiff's arguments that the executive exemption does not apply are based on misconstructions of the regulatory provisions.

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

Defendant Compass Group USA, Inc., d/b/a/ Chartwells, operates food service facilities at a number of college campuses. In particular, it operates the Commons Restaurant, or "the Commons," a dining hall at the University of Wisconsin–Whitewater. The Commons seats 250 persons and a cafeteria style lunch is served there daily. In addition to these daily lunches, the kitchen for the Commons is used to prepare catered meals for special events. Defendant hired plaintiff Scott Scherer to work at the Commons as an Executive Chef I, effective June 7, 2002. On both his application and letter of resignation, plaintiff's official title is identified as "Executive Chef of Catering." According to plaintiff's job description, the Executive Chef was employed in defendant's food service department and was to report to the food service director.

## A. *Institutional Organization of the Commons*

Defendant operated the Commons through its catering department. Employees of the Commons refer to its kitchen as the "back of the house" and to its dining area as the "front of the house." Generally, kitchen staff work separately from employees in the front of the house. Jeff Zwolak, the director of defendant's catering department, oversaw all operations of the Commons, including food preparation, food service and special event catering. Plaintiff was responsible for insuring food production in the Commons kitchen and had primary responsibility for its day-to-day management. Lynette Hulgan, defendant's assistant catering director, supervised regular and student employees in the Commons dining area. Plaintiff and Hulgan shared an office although plaintiff had a separate desk, phone line and email account.

Zwolak was the direct supervisor of both plaintiff and Hulgan. Plaintiff usually spoke to Zwolak several times each day and in most instances, would go to him first if a problem arose. Aside from supervising plaintiff and Hulgan, Zwolak's primary duties included overseeing the serving area, meeting with customers and handling beverages and logistics for catered events. Occasionally, both Zwolak and Hulgan would assist with the supervision of kitchen staff. This happened more often when they were preparing an order for a catering event. Plaintiff had authority to supervise student workers in the dining area, although he rarely ever did. In addition, plaintiff remained in charge of kitchen employees, even when they were in the dining area. Plaintiff, Hulgan and

---

**1.** On April 20, 2004, the Department of Labor announced revisions to regulations governing overtime pay, changing the tests for the "white-collar" exemptions under the Fair Labor Standards Act. The new regulations were formally adopted on August 23, 2004. However, they are not retroactive and therefore, have no bearing on this case.

Zwolak worked together to achieve the goal of effective and efficient operation of the Commons.

Zwolak's direct supervisor was Brenda Hinspater, the catering department's retail operations director. Hinspater oversaw the managers who operated defendant's six other restaurants on campus. Each day, she made a rotation, visiting all seven operations. She made frequent but brief trips to the Commons kitchen and usually spent five to ten minutes there each day. If there were a special event at the Commons, Hinspater spent additional time there. (There is a disputed issue of fact as to how much time Zwolak spent in the kitchen. The amount of time falls somewhere between "occasional," Scherer Dep., dkt. # 9, at 41, and "a lot," Hinspater Dep., dkt. # 10, at 15.)

Hulgan arranged contracting for catered events. Once she prepared the contract, she sent Zwolak and plaintiff copies. She would arrange for appropriate staffing and Zwolak would make certain that there were sufficient linens. Plaintiff created cost estimates for the menu and presented those estimates to Zwolak, Hulgan and Hinspater. At weekly catering meetings, Zwolak, Hulgan and plaintiff discussed the weekly catering events, what foods plaintiff would need to order and what time plaintiff would need to have catered food ready.

The dining area was open from 11:00 a.m. to 2:00 p.m. Monday through Friday when school was in session. It was closed on the weekends, holidays, throughout the summer and for approximately one month during the winter break. Even when the dining area was closed, the kitchen was often open for catering events.

### B. Plaintiff's Duties

As executive chef, plaintiff's primary duty was to oversee food production for both regular and catered meals. Plaintiff had primary responsibility for preparing three-week menu cycles for the daily lunches. After researching new recipes and drafting a new menu schedule, plaintiff submitted it to Brenda Hinspater, who would often make changes before approving it. Plaintiff had authority to alter the planned menu occasionally.

Plaintiff was expected to determine the amount and manner of all food production in the kitchen. In addition, he was responsible for ordering food and other kitchen supplies, although he did not order major kitchen equipment, dishes or utensils. When he ordered products for catered events, he used defendant's preprinted form entitled "Product Approval Form For Additions To Distributor Order Guides," which indicated that he was the contact person for "Chartwells Catering." Plaintiff kept track of current inventory, predicted the impact of food spoilage and generated price estimates. He took inventory approximately once each week. When he began to have trouble keeping up, Zwolak hired a student, who essentially took over the task of conducting inventory. Plaintiff was responsible for supervising the student.

When food and supplies were delivered, plaintiff was responsible for storing them and maintaining receipt logs. Usually, one of the kitchen workers would assist plaintiff in putting away delivered items. Plaintiff audited the Commons kitchen for compliance with sanitation standards once during his employment with defendant. During the two to three hour long audit, plaintiff discovered and corrected a number of sanitation violations.

Plaintiff was responsible for training the hourly staff, insuring their productivity and compliance with sanitation standards and providing information relevant to disciplinary measures when necessary. The full-time kitchen employees whom plaintiff supervised included a full-time cook, salad

preparer, line server, dish washer and a general service operator. Because most of the staff already knew how to do their jobs adequately when plaintiff arrived, his training obligation was to improve or update their skills and correct occasional mistakes. For example, plaintiff might instruct an employee on chopping techniques that would minimize the risk of injury or teach another how to monitor safe serving temperatures. He instructed the line server how to display food and maintain appropriate serving temperatures and he taught the dishwasher how to maintain temperature logs. Plaintiff gave 18 five-minute presentations on sanitation procedures and provided other training on inventory rotation procedures.

On an average day, plaintiff spent approximately 75% of his time preparing food. (Defendant attempts to dispute this by citing deposition testimony in which plaintiff stated that he spent the "majority" of his time cooking. I do not believe that this testimony in any way conflicts with his later estimation of 75%. In any event, evidence is to be construed in the light most favorable to the non-moving party for the purpose of resolving a motion for summary judgment. Thus, even if defendant had cited conflicting evidence, the 75% approximation would govern.) Although plaintiff spent a large portion of his day cooking, he was able to observe and monitor the kitchen staff while doing so. The salad preparer once attempted to prevent plaintiff from watching over her shoulder by placing a cart between herself and him but plaintiff moved the cart and continued to monitor her performance.

When he first started his employment, plaintiff arrived between 6:00–6:30 a.m. to unlock the door to the Commons. At some point during his tenure, one of the kitchen staff was given a key so that he could open the door. After this, plaintiff began arriving later. Plaintiff spent about 15 to 30 minutes each day drafting production sheets for each of the workers in the kitchen. The production sheets outlined the types and amounts of food to be prepared that day and the manner of preparation and presentation. Plaintiff distributed copies of the schedule at the various stations throughout the kitchen and reviewed them with the staff as they arrived. While lunch was being served in the dining area, plaintiff spent approximately forty-five minutes placing orders for food and other supplies to be delivered the following day. During this time, plaintiff would intermittently insure that food displays remained adequately stocked. At the end of the day, plaintiff would oversee kitchen clean up and food storage; each worker cleaned her area and the dishwasher cleaned common areas, mopped the floors and disposed of garbage.

Plaintiff would assign staff additional tasks if he thought that they were not being productive or did not have enough to do. He monitored their breaks to make certain that the staff did not exceed their fifteen-minute allotment. The staff who worked in the kitchen regarded plaintiff as their supervisor and workers in the front of the house thought of him as the kitchen manager.

The employees were paid an hourly rate of $10–11 and were represented by the Hotel Employees and Restaurant Employees International Union, A.F.L.-C.I.O., Local 122. On days when the dining area was open, the same five people staffed the kitchen. Plaintiff did not interview or hire them and had no say in setting their wages. If plaintiff did not like the way that one of the employees was performing, he could use written "coach and counseling" procedures. However, to use these procedures, plaintiff had to get another member of management and a union steward involved. Plaintiff had no authority to

discipline employees on his own; instead, he reported problems to Brenda Hinspater. Sometimes, Hinspater would consult with plaintiff before disciplining an employee. In one instance, she consulted with plaintiff before terminating a particular employee.

The union and defendant are parties to a collective bargaining agreement that provides, "Management personnel cannot hold down a station as part of their regular duty, except in an emergency situation, training or when production difficulties (not to exceed twenty-four hours per bona fide emergencies) are encountered during the regular school year." In addition, the agreement provides that the union could file a grievance against defendant if this clause were violated. Plaintiff often worked at the hot food station while he was preparing food but the union never filed a grievance on the matter.

The collective bargaining agreement limited plaintiff's ability to ask kitchen staff to work over their scheduled time. It provided that whenever there were other overtime opportunities because of a catering event for more than fifty guests, they had to be offered to employees on a seniority basis. However, plaintiff could ask employees to stay up to an hour past their scheduled shift, which he did about once each week.

For catering events, plaintiff calculated the costs for regular menu items and submitted his calculations to Zwolak and Hinspater, who would set the final prices. Occasionally, plaintiff would set catering prices for items not on the regular menu. When there was a small catered event scheduled but the dining area was not open, plaintiff would prepare all the food for the catering function by himself if no other kitchen staff were scheduled for that day. When he had a large catering event or more than one on a single day, plaintiff would have some of the hourly employees assist him with food preparation. Plaintiff was not in charge of arranging for staffing on catering events but sometimes Hulgan asked him for his opinion on staffing needs for a particular event.

### C. Plaintiff's Employment Status and Compensation

At the time plaintiff was hired, he was aware that the position was salaried and did not pay overtime. His starting salary was $769 each week, which amounts to an annual salary of over $39,000. Defendant categorized plaintiff as a grade 12 manager. Its managerial levels went down to grade 9 and all managerial levels were salaried with no overtime pay. Plaintiff did not have set hours but was free to determine his own schedule. Plaintiff's final day of employment with defendant was June 21, 2003.

### OPINION

 The Fair Labor Standards Act requires employers to pay their non-exempt employees one and one-half their normal hourly rate for all hours worked over forty during a work week. 29 U.S.C. § 207(a)(1). However, this requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Defendant contends that this so-called "white-collar" exemption applies in this case. Because the exemption is an affirmative defense, defendant bears the burden of establishing its application. *Piscione v. Ernst & Young, L.L.P.,* 171 F.3d 527, 533 (7th Cir.1999) (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). As a general matter, such exemptions are narrowly construed, *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959), and applied only where they "plainly and unmistakably comes within the statute's terms

and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

The Act delegates the power to define the scope of the overtime and exemption provisions to the Secretary of Labor, who has promulgated two tests for evaluating whether an employee qualifies as an exempt salaried employee who works in an executive capacity. 29 C.F.R. §§ 541.1. *See also Piscione,* 171 F.3d at 533 (secretary's regulations have force and effect of law). The "long test" applies to employees who earn between $155–250 each week, while the "short test" applies to those who earn more than $250 weekly. 29 C.F.R. § 541.1(f). It is undisputed that plaintiff earned more than $250 per week. Therefore, the short test governs this case. The short test has three criteria: (1) The employee must be paid on a salary basis; (2) his "primary duty [must] consist[ ] of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; and (3) his work must include "the customary and regular direction of the work of two or more other employees therein." 29 C.F.R. § 541.1(f). *See also Demos v. City of Indianapolis,* 302 F.3d 698, 701 (7th Cir.2002); *Haywood v. North American Van Lines, Inc.,* 121 F.3d 1066, 1069 (7th Cir.1997).

### A. Salary Basis Employee

An employee satisfies the salary basis standard if "under his employment agreement he regularly receives each pay period ... a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or the quantity of the work performed." 29 C.F.R. § 541.118(a). "If an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee is not considered to be on a salary basis." *Piscione,* 171 F.3d at 534. Both parties agree that plaintiff was a salaried employee and that the first requirement of the short test is satisfied. Dft.'s Br., dkt. # 17, at 7; Plt.'s Br., dkt. # 20, at 3–4.

### B. Management as Primary Duty

The second requirement of the short test is that the employee's "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.1(f). The parties' primary dispute is whether the kitchen qualifies as a "customarily recognized department or subdivision thereof." In defining this term, 29 C.F.R. § 541.104(a) provides that "[t]he phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of men assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." The provision also indicates that the department or subdivision must be a "recognized unit with a continuing function." *Id.* "[F]ixed location and continuity of personnel are both helpful in establishing the existence of such a unit." 29 C.F.R. § 541.104(c).

The regulations provide a number of illustrations. For example, a construction crew could be considered a recognized department or subdivision despite the fact that the location of their work changes regularly. 29 C.F.R. § 541.104(d). A unit might qualify if it is responsible for performing all installations for the employer in a particular geographic area even if the employee in charge of this unit "draws his subordinates from a pool of available men." 29 C.F.R. § 541.104(e). However, "a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool and who is assigned a job or series of jobs from day to day or week to

week ... is not in charge of a recognized unit with a continuing function." 29 C.F.R. § 541.104(f).

### 1. *Continuing function*

Plaintiff contends that the evidence shows that the catering department is the "lowest" organizational unit with a continuing function recognized by defendant. Plt.'s Br., dkt. # 20, at 13. He cites *Amos v. United States*, 13 Cl.Ct. 442 (1987), for the proposition that baking, preparing meals, serving and cleaning both cooking and dining areas must be treated collectively as a single "continuing function" of providing food service. In *Amos*, a group of cook foremen at a federal corrections institution brought an action for overtime pay. At the corrections facility, "[f]ood service [was] generally divided into groups for purposes of baking, preparing meals, serving and cleaning up the kitchen and dining room areas." *Id.* at 443. The plaintiffs were assigned to these groups for different shifts during the day. In a very brief discussion, the court held that the food service unit qualified as a recognized organizational unit: The inmates who worked in food services had different duties and a pay classification distinct from other inmate workers; their hours were regular; many of the inmates held the same position for six months or more; and the unit functioned cohesively in preparing and serving food. *Id.* at 447. From this holding, plaintiff extrapolates a rule that food preparation and service are necessarily intertwined.

On its face, *Amos* does not address the issue whether it would have been appropriate to consider each group as a recognized organizational unit. However, in a subsequent case, the Court of Federal Claims made clear that it would not have been. *Baca v. United States*, 29 Fed.Cl. 354, 362 (1993). In *Baca*, the court said that had it treated each group as an individual unit in *Amos*, it would have "ignored both the

continuing function requirement and the definition contained in the FPM Letter No. 551–7, which provides that a 'recognized organizational unit' consists of '[a]n established and defined organizational entity with regularly assigned employees.'" *Id.* (Emphasis omitted). The court noted that workers rotated through the different groups and that none of the groups carried out the "entire food service function" independently. *Id.*

First, I do not read either *Amos* or *Baca* to say that food production and service must be regarded as interdependent tasks. In *Amos*, the court had to analyze the food service unit collectively because workers and foremen rotated through the various groups. Thus, the relevant question was whether these production, service and cleaning activities collectively qualified as a "continuing function." Certainly, the court was correct in *Baca* when it held that if the "continuing function" is defined as "food preparation and service," as it was in *Amos*, then none of the individual groups carried out this function independently. However, the fact that food preparation and food service can be treated collectively does not mean that they necessarily must be. I see no reason, and plaintiff does not provide one, for drawing such a negative inference from the holding in *Amos* or the discussion in *Baca*.

■ Moreover, there is no reason why cooking and service should be treated collectively in this case. In contrast to the facts in *Amos*, defendant's employees do not rotate through preparation and service positions. Plaintiff attempts to portray the entire catering department as so enmeshed that food preparation, cafeteria meal service and special event catering cannot be considered independent functions. He contends that the kitchen "would not function without the involvement of the catering staff ... catering

department staff, other than [plaintiff], contracted with catering customers ... [and] these catering contracts drive what is assembled in the kitchen for each event." Plt.s' Br., dkt. # 20, at 13. The Commons kitchen is not dependent on catering jobs because it also provides food for daily lunches in the dining hall. Similarly, the kitchen is not dependent on service in the dining hall because it prepares food for catering. Certainly, service in the dining hall and catering functions have little to no overlap. The fact that employees engaged in food preparation were supervised by plaintiff, that employees serving food in the dining hall were supervised by Zwolak and that Hulgan was primarily responsible for contracting and staffing special catering events confirms the separateness of these three subdivisions. That both food production and food service are necessary for the final objective of providing meals does not mean that neither qualifies as a "function." Accordingly, I conclude that the kitchen satisfies the "continuing function" standard; plaintiff and the five regular employees whom he was responsible for supervising had sole responsibility for food preparation.

### 2. *Customarily recognized department or subdivision thereof*

Next, plaintiff contends that the kitchen was not a customarily recognized department. In support of his argument, plaintiff cites evidence showing that catering was a recognized department and that plaintiff was a member of it: plaintiff reported to and was supervised by the catering director, attended weekly catering meetings and his title was "executive chef of catering." Plaintiff questions why he reported to Zwolak and not Hinspater "[i]f in fact the kitchen department was a separate stand-alone department." Plt.'s Br. dkt.# 20, at 17. He concludes by stating that "[t]here simply was no functional independence of the Commons kitchen

from the Catering Department" and that defendant failed to show that it " 'recognized' the Commons kitchen as a separate and distinct department with functional independent from the Catering Department." *Id.* Plaintiff seems to think that if it is clear that catering was a recognized department and that plaintiff was a member of that department, then the kitchen does or can not satisfy the applicable standard.

29 C.F.R. § 541.1(f) provides that the employee's primary duty must be "the management of the enterprise in which the employee is employed or of a customarily recognized department *or subdivision thereof.*" (Emphasis added). Although plaintiff does not raise the argument, I note that it is not clear on the face of this section whether "thereof" refers to "the enterprise" or "department." In other words, this sentence could be read either to refer to departments of the enterprise or subdivisions of the enterprise, or it could be read to refer to departments of the enterprise or subdivisions of these departments. A later regulation defining the phrase "customarily recognized department or subdivision" makes clear that the latter interpretation was intended. 29 C.F.R. § 541.104(b) ("In the vast majority of cases, there is no difficulty in determining whether an individual is in charge of a customarily recognized department or *subdivision of a department.*") (emphasis added). It is clear that divisions beneath the level of a formal "department" are sufficient so long as they are "customarily recognized." Plaintiff's argument that defendant must show that the kitchen was a "separate and distinct department with functional independence from the Catering Department" imposes a standard more demanding than the one created by the regulations and his attempt to read the regulations to say that "functional groupings" within departments are never sufficient is

not supported by the text. Plt.'s Br., dkt. # 20, at 20.

Plaintiff also attempts to read the word "customarily" out of the regulation; his arguments suggest the need for formal recognition. For example, plaintiff notes the absence of forms or other materials referring to the "kitchen department" or the "back of the house department." In addition, he argues that his title was executive chef of catering and not kitchen manager. Notably, aside from quoting the first sentence of 29 C.F.R. § 541.104, which provides that "the employee's managerial duties must be performed with respect to the enterprise in which he is employed or a customarily recognized department or subdivision thereof," at the beginning of his argument, plaintiff does not use or acknowledge the word "customarily" anywhere in his eight-page argument; instead, he simply uses the word "recognized" without qualifier.

There is one sentence in § 541.104 in which the word "recognized" stands alone, 29 C.F.R. § 541.104(a) ("He must be in charge of and have as his primary duty, the management of a recognized unit which has a continuing function."). However, this sentence must not be read to render other language superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (courts should avoid constructions that render another part of same provision superfluous); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 954 (7th Cir.2004) ("interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy"). Moreover, reading this sentence in context, its thrust appears to contrast with the preceding sentence, which provides that it is insufficient that an employee merely participate in the management of the unit. 29 C.F.R. § 541.104(a).

Although plaintiff's characterization of the applicable standard is unduly burdensome, defendant still bears the burden of showing that the kitchen was "customarily recognized." To this end, it has submitted a chart purportedly showing its organizational structure as of August 2002. There is no indication when the chart was created either on its face or on the affidavit to which it is attached. Because the relevant standard is that the division was "customarily recognized," this chart would not help defendant in the event that it was created for use in this suit. Moreover, the chart only shows the hierarchy of various positions (i.e. the executive chef reports to the catering director, who in turn reports to the retail director); it does not purport to show the hierarchy of departments and subdivisions. Finally, defendant suggests that this chart shows that the kitchen was a recognized entity. At best, the chart identifies plaintiff as "executive chef"; neither the word "kitchen" nor "Commons" appears anywhere on it.

Although the chart provides little assistance, defendant also submitted evidence showing that the employees referred to the kitchen as the "back of the house" and to the dining area as the "front of the house," that kitchen staff work independently from employees in the front of the house and that kitchen staff remain constant and are not rotated. Even more tellingly, defendant has shown that under its organizational structure, immediate supervision of the front of the house and immediate supervision of the kitchen and food production were conducted by different persons. Certainly, this evidence is sufficient to distinguish the kitchen from "a mere collection of men assigned from time to time to a specific job or series of jobs." 29 C.F.R. § 541.104(a). Thus, I conclude that in addition to having a continuing function of food preparation, it was customary for defendant to recognize the

kitchen as a distinct subdivision of the catering department.

### 3. *Primary duty of management of kitchen*

Now that I have concluded that the kitchen qualifies as a "recognized department or subdivision thereof," I must turn to the issue whether plaintiff's primary duty was to manage it. The regulations define "management" to include the following:

> [i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; [and] providing for the safety of the men and the property.

29 C.F.R. § 541.102. In determining whether such tasks were an employee's "primary duty," the regulations provide the following guidance:

> A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty.

29 C.F.R. § 541.103. Plaintiff spends approximately 75 percent of his day preparing food and only 25 percent engaged in managerial duties. However, as § 541.103 makes clear, "[t]ime alone [ ] is not the sole test." Moreover, as the example provided in § 541.103 demonstrates, the fifty percent standard is less appropriate when managerial tasks cannot "readily and economically be separated from the nonexempt tasks." *Baldwin v. Trailer Inns,*

*Inc.,* 266 F.3d 1104, 1114 (9th Cir.2001). *See also Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (1st Cir.1982) ("a strict time division is somewhat misleading here: one can still be 'managing' if one is in charge, even while physically doing something else. The 50 percent rule seems better directed at situations where the employee's management and non-management functions are more clearly severable than they are here."). In this case, it is undisputed that plaintiff monitored the performance of other staff working in the kitchen during the time he spent preparing food.

█ In any event, applying the other pertinent factors to the facts in this case leads to the conclusion that management was plaintiff's primary duty. Certainly, his responsibility for planning menus, overseeing the amount and manner of food production, maintaining appropriate food supplies, overseeing staff performance and productivity and drafting daily production sheets was of far greater importance than his responsibility for assisting with food preparation. The relevant importance of plaintiff's managerial duties over his performance of the same food preparation tasks as other kitchen staff is confirmed by his salary, which was nearly twice that of the other kitchen employees. (Plaintiff received $769 each week while the kitchen staff were paid $10–11 each hour and ordinarily, did not work more than forty hours each week.)

In addition, plaintiff regularly exercised discretion. In maintaining appropriate food supplies, he was responsible for approximating rates of spoilage and demand. He had authority to instruct kitchen staff how to perform their jobs, assign them additional tasks and monitor their breaks. He was also authorized to ask kitchen staff to stay up to an hour longer than their scheduled shift and had discretion in setting his own schedule. He created three-

week menu cycles and although the menus were subject to approval from Hinspater, "[t]he term 'discretion and independent judgment' ... does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.207(e). In *Cobb v. Finest Foods, Inc.,* 755 F.2d 1148, 1150 (5th Cir.1985), an employee with nearly identical latitude was held to qualify as an exempt executive. In that case, the employee had discretion in setting his own schedule, determining methods of food preparation, training and supervising cooks and planning menus. *Id.*

As plaintiff notes, his discretion was not as broad as it conceivably could have been. For example, plaintiff notes that although he made most determinations about what to order, he did not order plates, utensils or large kitchen equipment. In addition, he acknowledges that he created daily production sheets and could apportion work among the kitchen staff but notes that he had certain pragmatic constraints such as assigning cooking tasks to the cook and work related to salad preparation to the salad preparer. Plaintiff observes that he was not empowered to promote, discipline or fire employees because such action was regulated by their collective bargaining unit and therefore, handled by those with more expertise in labor relations. First, the exercise of discretion is a mandatory requirement only under the long test, 29 C.F.R. § 541.1(d); under the short test, it is a single consideration among many, 29 C.F.R. § 541.103(b). Moreover, the relevant standard is the frequency of the exercise of discretion. In this case, the evidence shows that plaintiff exercised discretion on a daily basis. Although plaintiff could have had a wider scope of discretion, some limited restrictions will exist in nearly every case. *See, e.g., Donovan,* 672 F.2d at 226 (assistant

managers exercised discretion in supervising other workers despite existence of well-defined policies and detailed instructions on performing certain tasks).

There is also evidence that both defendant and the staff in both the Commons kitchen and dining area regarded plaintiff as a manager. Defendant provided plaintiff with a key to the building, a shared office, an individual phone line and a personal email account. Kitchen staff considered him to be their immediate supervisor and dining area staff thought of him as the kitchen manager.

Finally, there is evidence that plaintiff was subject to some supervision. Hinspater usually visited the kitchen daily; however, she usually stayed only five to ten minutes. Zwolak was also in the kitchen on a daily basis although it is not clear how much time he spent there or how closely he scrutinized plaintiff. (Plaintiff notes that he frequently sought Zwolak's advice. However, seeking out guidance is different from being subject to close supervision. In a sense, deciding when to ask for advice or directions is itself an exercise of discretion.)

Balancing the foregoing considerations, I conclude that management of the Commons kitchen was plaintiff's primary duty: plaintiff supervised other employees while he performed other non-exempt work, he exercised discretion on a daily basis and was paid nearly double the wage earned by the hourly employees who worked in the kitchen. The fact that plaintiff's discretion was subject to some limitations and that he may have been supervised on a fairly regular basis is not sufficient to tip the scale. *Haywood,* 121 F.3d at 1073 ("fact that [plaintiff] had supervisors who reviewed [his] work does not defeat [his] exempt status").

## C. *Customary and Regular Direction of Two Other Employees*

The final prong of the short test is that the employee's job duties must include the "customary and regular direction of the work of two or more other employees." 29 C.F.R. § 541.1(f). Plaintiff regularly supervised five full-time kitchen workers: a full-time cook, salad preparer, line server, dish washer and a general service operator. Plaintiff does not dispute this but instead relies on the regulation defining the "two or more other employees" to revive his argument that he cannot qualify as an exempt executive unless he was in charge of the entire catering department. 29 C.F.R. § 541.105(b) states that "the employees supervised must be employed in the department which the 'executive' is managing." Plaintiff reads this provision as requiring that the employee manage something with the title "department."

Plaintiff's construction is unpersuasive for a number of reasons. First, it is inconsistent with the provision's clear meaning when it is read in context. *See Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (interpretation should not render provisions inconsistent, meaningless or superfluous). The provision purports to define § 541.1, which provides in relevant part that an employee with a salary in excess of $250 each week is exempt if his "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees *therein.*" 29 C.F.R. § 541.1(f). "Therein" refers to the relevant enterprise, department or subdivision of a department. Reading these two provisions together, it is clear that the word department was intended to refer general-

ly to the relevant organizational division previously identified.

Even if the provision's meaning were not clear from context, interpretive provisions should not be used to substantively alter the meaning of the text it is intended to clarify. This is particularly true in this instance; under his construction, plaintiff uses an interpretive provision (§ 541.105), which defines the third prong of the short test (regular supervision of two or more employees) to alter the express language governing the second prong (primary duty of management of recognized department or subdivision thereof). "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). "Interpretations inconsistent with that structure and context should be rejected." *United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunition*, 376 F.3d 709, 712 (7th Cir.2004).

When read in the context of the entire regulatory scheme, 29 C.F.R. § 541.105(b) requires that plaintiff supervise at least two employees who are employed in the customarily recognized unit which he managed. The undisputed fact that he supervised five full-time employees in the Commons kitchen satisfies this requirement. Because defendant has shown that plaintiff meets all three prongs of the short test, plaintiff will not be entitled to recover overtime pay pursuant to 29 U.S.C. § 207(a).

## ORDER

IT IS ORDERED that the motion of defendant Compass Group USA, Inc., d/b/a/ Chartwells for summary judgment

on plaintiff Scott Scherer's claim for overtime wages under the Fair Labor Standards Act, 29 U.S.C. § 207(a) is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.